_____

**Ramsi A. Woodcock**                                    *Appellant*

On appeal from the United States District Court
for the Eastern District of Kentucky
v.                          Civil Action No. CV 5:25-424-DCR
Hon. Danny C. Reeves, United States District Judge

**University of Kentucky, et al,**                        *Appellees*

_____

## THE UNIVERSITY DEFENDANTS'
## RESPONSE TO WOODCOCK'S EMERGENCY MOTION
## FOR INJUNCTION PENDING APPEAL

_____

For the reasons below, the Court should deny Woodcock's

Emergency Motion for Injunction Pending Appeal [R.6].[1]

---

[1] This Response is filed for the University of Kentucky, and President Eli Capilouto, Provost Robert DiPaola, General Counsel William E. Thro, and Dean James C. Duff in their official and individual capacities ("University Defendants"). On February 3, Woodcock filed yet another "emergency" motion [R.13] requesting a ruling on his pending motion and raising issues that were not raised in the district court or his first emergency motion. Unless ordered otherwise, these Defendants will respond to that motion consistent with the Rules.

## **INTRODUCTION**

Ramsi Woodcock is an anti-trust scholar and a Professor of Law at the University of Kentucky. Woodcock publicly rejects the foundational idea of Israel—"the right of the Jewish people to national rebirth in its own country" and "to be masters of their own fate, like all other nations, in their own sovereign State."[2] Woodcock goes beyond this to "explicitly argue for the violent destruction of Israel and laying out a plan for a global war against the Jewish State."[3] In essence, he publicly urges for the annihilation of a sovereign nation and the Jewish people who constitute it.[4] Calling for a second holocaust is antisemitic under the

---

[2] DECLARATION OF ISRAEL'S INDEPENDENCE (May 14, 1948), archived at THE AVALON PROJECT, Yale Law School, https://perma.cc/US4D-5PMN.

[3] Luke Tress, *US Professor Sues University for Probing His Call for Global War to "End Israel"* THE TIMES OF ISRAEL (Nov. 15, 2025) (citation modified) (https://perma.cc/9Z45-G5GE).

[4] Ramsi Woodcock, *We Need An International Coalition to Declare War on Israel Right Now*, Antizionist Legal Studies Movement (Dec. 10, 2024), https://perma.cc/44KH-9SVC ("The lesson is clear: to stop the Palestinian Genocide, the world must go to war against Isreal."); Ramsi Woodcock (@RamsiWoodcock), X (Sept. 27, 2024), https://perma.cc/SYH6-BKHL ("The destruction of Isreal is a global moral imperative for our age. . . . Anyone not calling for it is a racist."); *Petition for Military Action Against Israel*, Antizionist Legal Studies Movement, https://perma.cc/YWV3-WSCD ("We demand that every country in the world make war on Israel immediately and until

definition used by both the federal government and the Commonwealth of Kentucky.[5]

Woodcock created a website to promote his Petition for Military Action Against Israel,[6] interjected his off-topic opinions at academic conferences,[7] posted his antisemitic views to the American Association of Law Schools and internal faculty listservs, and characterized all Israelis as pro-genocide at a public event while serving as Chair of the law school's Committee on Community Engagement.

While the University of Kentucky is "deeply committed to safeguarding academic freedom,"[8] the University also has obligations under state and federal law. Because antisemitic conduct can violate

---

such time as Israel has submitted permanently and unconditionally to the government of Palestine everywhere from the Jordan River to the Mediterranean Sea.").

[5] S.J.R. 55, 2025 Ky. Acts Ch. 157.

[6] To review the Petition, see Ramsi Woodcock, Petition for Military Action Against Israel, https://perma.cc/M4FL-PLYY.

[7] The Global Antitrust Institute, 27th Annual George Mason Law Review Antitrust Symposium: Panel Three, at 0:12:42, YouTube, https://www.youtube.com/watch?v=zujnq8IWEKk (last visited Feb. 2, 2026).

[8] *See* Exhibit 1, July 22, 2025 Notice of Investigation, R.26-1, PageID#1427–30.

Title VI,[9] and because the University cannot ignore a possible Title VI violation,[10] the University began to investigate Woodcock's actions following complaints it received.[11]

On July 22, 2025, the University informed Woodcock of the investigation, and emphasized that it "is not investigating any viewpoints or speech expressed in [his] personal capacity."[12] The University assured Woodcock that it "reviews reports objectively and does not advocate for either party," and that he "could submit statements, information, or supporting evidence through the course of this

---

[9] Exec. Order No. 13,899 (Combating Anti-Semitism), 84 Fed. 68,679 (Dec. 11, 2019).

[10] Like all recipients of federal funds, when the University becomes aware of a possible violation of Title VI, it must respond with something other than deliberate indifference. *See Malick v. Croswell-Lexington Dist. Schs.*, 148 F.4th 855, 862 (6th Cir. 2025).

[11] As individuals who are "accessing university libraries or other resources, or attending campus tours, sporting events, or other activities" can bring a Title IX claim, *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 708 (6th Cir. 2022), and Title IX and Title VI are interpreted in the same way, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258–59 (2009), so it follows that anyone who interacts with the University or its employees can sue under Title VI. Moreover, in recent months, the federal government has investigated many institutions for alleged Title VI violations.

[12] *See* Exhibit 1, July 22, 2025 Notice of Investigation, R.26-1, PageID#1427–1430.

investigation."[13] The University Notice of Investigation[14] and subsequent Amended Notice of Investigation,[15] which define the scope of the University's inquiry, have focused on whether: (1) he used university resources to develop and promote his Petition for Military Action Against Israel; (2) seizing control of a panel discussion at two academic conferences unrelated to the Israeli-Palestinian conflict to present his views; (3) used his university email address to send spam to the American Association of Law Schools listserv and internal faculty listserv setting out antisemitic views; (4) while serving as Chair of the law school's Committee on Community Engagement, made antisemitic comments at a public event; and (5) violated various university policies.[16]

As it routinely does, the University reassigned Woodcock to other duties and continues to pay him his full salary[17] while the University

---

[13] *Id.*

[14] *Id.*

[15] Exhibit 2, September 8, 2025 Amended Notice of Investigation, R.26-2, PageID#1438–39.

[16] *Id.*; Exhibit 1, July 22, 2025 Notice of Investigation, R.26-1, PageID#1427–30.

[17] This Court held the University's practice of reassigning a professor while an investigation is pending does not violate a professor's rights. *Cunningham v. Blackwell*, 41 F.4th 530, 536–39 (6th Cir. 2022).

conducts a multi-stage fact-gathering investigation that will include multiple opportunities for Woodcock to respond to the allegations and the evidence being gathered. At an August 22, 2025 meeting, Woodcock expressed concerns about the due process he would receive. The process was detailed in an August 25, 2025 letter where the University also acknowledged and reiterated Woodcock's statement that "this investigation may raise unique First Amendment issues."[18] As it explained, the University first intended to interview witnesses and gather relevant records, and then to make that evidence available to Woodcock for a first review and then a second review before the investigator made a final report to the University.[19] The University—*not the investigator*—is the decision-maker, which adds yet another layer of due process and objectivity.[20]

---

[18]  Exhibit 3, Farnaz Farkish Thompson August 25, 2025 correspondence to Joe Childers, R.26-4, PageID#1452–1454.

[19]  *Id.*

[20]  *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004).

Yet Woodcock does not want to participate in the investigation or for the University to initiate due process proceedings.[21] He has repeatedly delayed the process.[22]

Specifically, Woodcock has attacked the investigator,[23] delayed for several weeks the return of the University's property,[24] delayed in providing supporting information to the investigator, and declined answering any questions from the investigator until the courts have ruled on his request for an injunction.[25]

---

[21] The investigation is in its final stages. For now, the investigator is waiting on Professor Woodcock to provide written answers to questions.

[22] *See Woodcock v. Univ. of Kentucky*, 2026 WL 64108, at \*5, 15 n.9 (E.D. Ky. Jan. 8, 2026); R.37, PageID#1758–98, at PageID#1768, 1788 (same); *see also* Exhibit 4, December 17, 2025 Declaration of Farnaz Farkish Thompson, R.26-4, PageID#1445–51.

[23] The University's investigator is a partner in a law firm with an education practice and a former Deputy General Counsel at the U.S. Department of Education. Professor Woodcock objects to the fact she is a Christian, a Republican, and played a minor role in the Heritage Foundation's Project 2025. *See* Exhibit 5, Joe Childers August 22, 2025 correspondence to Farnaz Thompson, R.26-3, PageID#1441–43.

[24] *See* Exhibit 6, correspondence between parties' counsel dated August 20–29, 2025, collectively attached, R.26-6, PageID#1480–1495.

[25] *See* Exhibit 7, Rima Kapitan December 3, 2025 email, R.26-8, PageID#1519; *see also* Exhibit 8, February 2, 2026 Declaration of Farnaz Farkish Thompson.

## ARGUMENT

**I. Because the district court abstained under *Younger*, this Court must decide the abstention issue before addressing the request for an injunction.**

Under *Younger v. Harris*,[26] the district court properly abstained.[27] When Woodcock appealed the decision to abstain and also sought an "emergency injunction" pending appeal in the trial court, the district court found "ordinary abstention principles caution against exercising jurisdiction under the circumstances presented."[28]

Now, Woodcock asks this Court to grant injunctive relief *before* deciding whether the district court was correct in abstaining. That is the wrong sequence. As the Supreme Court made clear, when an abstention doctrine applies, no federal court—either trial or appellate—can grant injunctive relief.[29] To even entertain Woodcock's request, this Court must

---

[26]   401 U.S. 37 (1971).

[27]   *Woodcock*, 2026 WL 64108, at *20.

[28]   *Woodcock v. Univ. of Kentucky*, 2026 WL 184253, at *2 (E.D. Ky. Jan. 23, 2026); R.46, PageID#2128–2133, at PageID#2130 (same).

[29]   *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 816 n.22 (1976).

first conclude abstention does not apply, thereby addressing the very merits of the appeal itself.[30]

Yet an *emergency* motion asking this Court to exercise *extraordinary* injunctive power pending appeal is *not* a vehicle for resolving the *disputed* legal questions of whether *Younger* applies. Indeed, such a request contradicts the very purpose of an emergency motion.[31] Moreover, Woodcock asks this Court—*in the first instance*—to grant injunctive relief where the district court did not reach the issue. That is not this Court's function.[32]

If Woodcock were to prevail in this appeal, the remedy is to instruct the district court to cease abstaining and actually consider Woodcock's request for an injunction.[33] Because this Court cannot entertain the request for injunctive relief without deciding the abstention issue and

---

[30]   *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

[31]   *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

[32]   *Singleton v. Wulff*, 428 U.S. 106, 120 (1976).

[33]   Although the district court held a preliminary injunction hearing in December, both its initial decision to abstain and its subsequent decision to abstain rather than address the emergency motion for an injunction did not address any of the injunctive factors. *See generally Woodcock*, 2026 WL 64108 (E.D. Ky. Jan. 8, 2026); *Woodcock*, 2026 WL 184253, at *1 n.1 (E.D. Ky. Jan. 23, 2026).

because it is inappropriate to address the abstention issue in an request for an emergency injunction, the University suggests the Court deny Woodcock's motion for an emergency injunction,[34] but also order expedited briefing and oral argument on his appeal of the abstention issue.[35]

## II. The District Court Properly Abstained.

As explained above, this Court cannot entertain Woodcock's request for injunctive relief before it addresses his appeal of the abstention issue. Also, it is inappropriate to address the merits of the abstention appeal in the context of an emergency motion.

However, if this Court decides to address the abstention appeal in the context of his motion, then the district court should be affirmed. The contours of *Younger* are clear. *Sprint*[36] dictates a federal court must

---

[34] The University is in the fourth week of the semester and the College of Law does not change professors or add new classes mid-semester, so Woodcock will not be harmed by denying his Emergency Motion.

[35] Given Woodcock has attached a *draft* Opening Brief on the abstention issue to his Motion, the University assumes he could file a *final* Opening within a few days of this Court's order denying the injunction and setting expedited briefing.

[36] *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79–80 (2013).

abstain where (a) one of the *NOPSI* categories is met;[37] (b) the three *Middlesex* factors are considered;[38] and (3) a plaintiff fails to meet one of the *Younger* exceptions.[39] For the reasons stated in both of the district court's opinions, which the University adopts and incorporates, abstention is appropriate. However, the University offers further explanation and clarification.

First, *NOPSI* is satisfied. This Court has already held the University's student disciplinary process meets the second *NOPSI* factor. So too for the faculty. Woodcock's is an ongoing state-initiated civil enforcement matter akin to a criminal prosecution. This University initiated the matter, Woodcock has been told the detailed nature of the process and the subject matter, and that severe consequences could ultimately apply—although that has yet to be determined. If Woodcock participates in the matter (the record shows how he has delayed and interfered thus far), he will have the opportunity to review the evidence,

---

[37] *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989).

[38] *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–34 (1982).

[39] *Doe v. Univ. of Kentucky*, 860 F.3d 365 (6th Cir. 2017).

offer his perspective, question the evidence collected by the University, provide supporting evidence, assert any constitutional and legal arguments, and plead his case.

Second, *Middlesex* is satisfied. The investigation began four months before Woodcock filed suit. His conduct led to complaints and the University must ensure it complies with Title VI. As a matter of federal law, it cannot ignore these complaints. A state interest is also involved where a public entity is presented with complaints of harassment and where the subject matter is tied to a federal and state legislative act. Woodcock has been repeatedly told he may provide any constitutional or other legal arguments he wishes.

Third, *Younger* is satisfied. This matter began with complaints made *to the University*. This state university detailed process, including the involvement on all sides by experienced legal counsel, rebuffs any idea the entity is incompetent by reason of bias. There is no improper pecuniary interest when a public institution follows acts of Congress and the Kentucky General Assembly. Nor can a policy and process which

specifically notes they will be applied consistently with the Constitution[40] somehow be flagrantly and patently unconstitutional in "every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it."[41]

## III. Professor Woodcock has not met the high burden for an injunction pending appeal.

Woodcock "bears the burden of showing that the circumstances justify" this Court's exercise of its discretion to grant injunctive relief pending appeal.[42] This Court "demands a significantly higher justification" than a request for a stay, because unlike a stay, an injunction "does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts."[43] Woodcock falls short, and his motion should be denied.

---

[40] *Woodcock,* 2026 WL 64108, *14; Exhibit 3, Farnaz Farkish Thompson August 25, 2025 correspondence to Joe Childers, R.26-4, PageID#1452–54; Exhibit 4, December 17, 2025 Declaration of Farnaz Farkish Thompson, at 21, R.26-4, PageID#1464.

[41] *Univ. of Kentucky*, 860 F.3d at 371.

[42] *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[43] *Respect Maine PAC v. McKee*, 562 U.S. 996 (2010).

**A.  Professor Woodcock has not shown an irreparable injury—a mandatory prerequisite for an injunction pending appeal.**

The "existence of an irreparable injury is mandatory,"[44] and Woodcock must show that he "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated."[45]

"Woodcock remains a tenured faculty member with full pay and benefits from the University."[46] As this Court has said, "an individual may lose his income for some extended period of time does not result in irreparable harm, as income wrongly withheld may be recovered through monetary damages in the form of back pay."[47] If the "loss of a job is quintessentially reparable by money damages,"[48] Woodcock fails to explain how his *paid* reassignment is *irreparable*. Although Woodcock cannot teach or enter the law school while the University investigates, a

---

[44]  *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883 (6th Cir. 2025).

[45]  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

[46]  *Woodcock*, 2026 WL 64108, at *19 (E.D. Ky. Jan. 8, 2026).

[47]  *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002).

[48]  *Id.* at 579.

"suspension with pay and full benefits pending a timely investigation into suspected wrongdoing" is not an irreparable injury.[49]

The University "removed [him] from the classroom teaching as an interim action, which is not an uncommon action. That is done when there is claims relating to – that could impact the educational environment."[50] Yet Woodcock invites this Court to enjoin *any* investigation because he has invoked the First Amendment to insulate him from the University's "standard procedure" for investigating complaints against its employees.[51]

## B.    Professor Woodcock has not shown a likelihood of success on the merits of his First Amendment claim.

Woodcock's motion fails for yet another, more fundamental reason: he has not shown—*nor can he show*—a "*strong*" likelihood of success on the merits. When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits

---

[49]    *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (citation omitted).

[50]    Transcript of December 19, 2025 hearing ("Trans."), R.40, PageID#1953, testimony of Sarah Mudd, Executive Director of the University's Office of Equal Opportunity.

[51]    Trans., R.40, PageID#1956.

often will be the determinative factor.[52] Yet Woodcock presents questionable constitutional claims built on speculation and seeks to prevent the University from reaching *any* conclusions. Put another way: Woodcock has not made the *required strong showing of a likelihood of success* on the merits of his claim (1) that *all* of his speech and conduct is protected; (2) that he so decisively wins on *Pickering* balancing; and (3) that a temporary reassignment of duties is an adverse action or that he has not been given sufficient due process.

Woodcock proclaims that all of his speech is protected.[53] The investigation *may* find this to be true, but the University has also articulated three alternative scenarios in which his speech would *not* be protected. First, if Woodcock is speaking as a University of Kentucky employee or using the University's resources to advance his speech, it is not constitutionally protected.[54] Second, if his expression amounts to harassment as defined by the Supreme Court,[55] then it is not

---

[52] *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

[53] Doc. 6-1, p. 17.

[54] *Garcetti v. Cabellos,* 547 U.S. 410, 417 (2006).

[55] *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

constitutionally protected.[56] Third, even if Woodcock was speaking as a private citizen and even if his speech did not constitute harassment, the University's interest in promoting its efficient operations may outweigh Woodcock's interests.[57]

Surprisingly, Woodcock's motion does not address *Pickering* balancing. Perhaps this is because the University's investigation remains incomplete. It is incomplete because Woodcock refuses to answer the written questions provided to him more than two months ago.[58]

Without question, the University has a strong interest in efficient operations while it conducts its investigation. The University's Executive Director of the Office of Equal Opportunity, Sarah Mudd, testified before the district court that a temporary reassignment with pay is the University's standard procedure while it conducts an investigation.[59] As

---

[56] *See DeJohn v. Temple Univ.*, 537 F,3d 301, 317–18 (3rd Cir. 2008).

[57] *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968) (citation modified).

[58] *See Woodcock*, 2026 WL 64108, at *5 (E.D. Ky. Jan. 8, 2026); *Woodcock*, 2026 WL 184253, at *2 n.2 (E.D. Ky. Jan. 23, 2026); *see also* Exhibit 4, December 17, 2025 Declaration of Farnaz Farkish Thompson, R.26–4, PageID#1455–64; Exhibit 8, February 2, 2026 Declaration of Farnaz Farkish Thompson.

[59] Trans., R.40, PageID#1953–54, 1956, testimony of Sarah Mudd, Executive Director of the University's Office of Equal Opportunity.

the law school's dean testified, reassignment is reasonable for safety reasons "because we . . . live in a pretty volatile time."[60]

Just as safety concerns justify the Professor's reassignment, federal law justifies the University's investigation. Because antisemitic conduct can violate Title VI, the University cannot ignore allegations of a Title VI violation, and the consequences of a Title VI violation are significant, the University had to investigate. Yet rather than initiating tenure revocation proceedings, the University "customized" the reassignment "to the problem at hand," preventing a possible Title VI violation while it investigates.[61] In short, *Pickering* balancing shows why a preliminary injunction is *not* warranted here.

Until its investigation is complete, the University may reassign Woodcock. The power to reassign is vital to an academic institution's functioning, and here, it gives the University needed space and time to complete its analysis under *Pickering* as it contemplates what action, if

---

[60] Trans., R.40, PageID#1973 (testimony of James Duff, Dean of the University's College of Law)

[61] *Cunningham*, 41 F.4th at 537.

any, to take, and if that action passes the balancing test. An injunction *now* would cut off the University's ability to get it right.

*One more point.* Woodcock continues to speak and has without hesitation. The day after being told of the University's investigation, Woodcock circulated a petition to faculty members titled "Pledge to Defend those who Reject Zionism," which and asked faculty members to "put pressure on institutions enacting this injustice," "use my training (as a lawyer, organizer, educator, etc.) to contribute resources and time to developing the many tactics of this diverse campaign," and pledge to "leverage within my role (as a politician, union member, religious leader, activist, etc.) to bring an end to this repression through advocacy within my institution."[62] According to that petition, "we are building a *network* to *confront*" others that do not join his cause.[63]

He has also spoken publicly about the investigation. He asked his colleagues on the faculty email to share their views with his lawyers,[64] to

---

[62] *See* Exhibit 9, Pledge to Defend those who Reject Zionism, Trans., R.40, PageID#1864–66.

[63] *Id.* (emphasis added).

[64] Exhibit 10, Woodcock's October 1, 2025, email to Faculty Listserv, Trans., R.40, PageID#1884–85.

not speak with the University investigator because he would not know what his faculty colleagues have said about him,[65] and later chastised his colleagues' silence and lack of support for him as "not doing this institution credit."[66]

As recently as January 28, 2026, Woodcock circulated yet another email to the Faculty in which he questioned Dean Duff's judgment and asked to be on the agenda at the next faculty meeting because, he said, the faculty "may wish to consider whether to take a confidence vote regarding our dean."[67]

Woodcock maintains an active X (formerly Twitter) presence,[68] and his own website,[69] commenting freely on Israel, Palestine, his administrative status with the University, and this litigation.

---

[65]  *Id.;* Trans., R.40, PageID#1887–1889.

[66]  Exhibit 11, Woodcock's October 16, 2025, email to Faculty Listserv, Trans., R.40, PageID#1894–1895.

[67]  Exhibit 12, Woodcock's January 28, 2026, email to Faculty Listserv.

[68]  *See* @RamsiWoodcock, https://x.com/RamsiWoodcock.

[69]  *See* ramsiwoodcock.net (home page states: "I am an American law scholar and Professor of Law at University of Kentucky's J. David Rosenberg College of Law who recognizes that my country is currently committing a genocide of Palestinians through the colony that we maintain in Palestine called the 'State of Israel'. I oppose the genocide and the existence of that colony. I believe that the international

### C. Professor Woodcock has not shown a likelihood of success on the merits of his due process claim.

To secure an injunction, Professor Woodcock must show "more than a mere possibility of success" on his due process claim.[70] Courts focus on two issues: (1) is there a constitutionally protected property interest; and (2) if so, the procedures necessary to protect that interest.[71]

### 1. Professor Woodcock has no property interest in teaching.

While tenured professors have a constitutionally protected property interest in their faculty position,[72] that interest does not extend to teaching classes.[73] The University retains the discretion to determine a faculty member's assignments, including whether and which courses a faculty member will teach. Indeed, this Court has permitted the

---

community has a moral and legal duty to go to war to liberate Palestine and end Israel").

[70] *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).

[71] *Crosby v. Univ. of Kentucky*, 863 F.3d 545, 552 (6th Cir. 2017).

[72] *Roth*, 408 U.S. at 576–77; *Sindermann*, 408 U.S. at 601–03.

[73] *Parate v. Isibor*, 868 F.2d 821, 832 (6th Cir. 1989); *see also Kaplan v. Univ. of Louisville*, 10 F.4th 569, 581, 586 (6th Cir. 2021) (observing similarities between *Kaplan* and *Parate*).

University of Kentucky to reassign faculty members during investigations.[74]

Woodcock's property interest in being a tenured professor does not allow him to choose his work assignments. Were it otherwise, the University could never direct faculty members to teach a particular class if they did not wish to do so.

## 2. Professor Woodcock has received due process.

Even if Woodcock has a property interest in teaching, "the question becomes whether the state actors provided adequate process."[75] That answer requires evaluation of the government's interest, the individual's stake in the matter, and the suitability of the procedures.[76] "Different circumstances call for different processes. While notice and an opportunity to be heard remain the hallmarks of due process, they need not necessarily arrive before the deprivation does."[77] Although a hearing of some sort is required before a tenured professor is fired,[78] a hearing is

---

[74] *Cunningham*, 41 F.4th at 536–37.

[75] *Id.* at 536.

[76] *Id.*; *Gilbert v. Homar*, 520 U.S. 924, 931–32 (1997).

[77] *Cunningham*, 41 F.4th at 536.

[78] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 & n.7 (1985).

*not* required before every intermediate action.[79] When the University "imposes a lighter penalty, such as a suspension, a post-deprivation hearing or a combination of pre- and post-deprivation safeguards may suffice."[80]

*Levy v. Bd. of Supervisors of Louisiana State Univ. & A&M College* illustrates the point.[81] There, a tenured professor challenged the university's "investigation into an anonymous student complaint of inappropriate, vulgar, and threatening statements that he allegedly made in one of his classes on the first day of the 2025 spring semester."[82] The court found the professor had received a letter that "served as notice that [he] was being immediately removed from his teaching responsibilities,"[83] and relied on the "well established" principle "that placement on paid administrative leave does not constitute deprivation of a property interest."[84]

---

[79] *Cunningham*, 41 F.4th at 536.

[80] *Id.* at 536–37.

[81] — So.3d —, 2025 WL 3124859 (La. Ct. App. Nov. 7, 2025).

[82] *Id.* at *2.

[83] *Id.* at *3.

[84] *Id.* at *4.

The same is true here. Woodcock *has not been fired or disciplined.* Instead, he has been reassigned—*at full salary*—while the University investigates. Because antisemitic conduct can violate Title VI, the University cannot ignore allegations of a Title VI violation and must investigate. However, rather than initiating tenure revocation proceedings, the University "customized" the reassignment "to the problem at hand," preventing a possible Title VI violation while it investigates.[85]

If the completed investigation provides concludes a violation occurred, and if the University determines tenure revocation or a lengthy suspension without pay is appropriate, then Woodcock will receive a formal hearing and, if found responsible, the opportunity to appeal.[86] Following that process, the President will determine whether to initiate tenure revocation proceedings.[87] If the President initiates tenure

---

[85] *Cunningham*, 41 F.4th at 537.

[86] Administrative Regulation—Due Process (Interim), https://perma.cc/JH4T-F477; R.26, PageID#1419.

[87] *Id.* at § II(F).

revocation proceedings, Woodcock will receive a full hearing before the Board of Trustees.[88]

## III. The equities and the public interest favor the University.

The third and fourth factors of the preliminary-injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party."[89] Professor Woodcock asks this Court to stop an investigation he refuses to participate in, return him to teaching mid-semester, override the University's federal compliance obligations, and substitute judicial judgment for academic governance—on an incomplete record. Equity does not favor that result for six reasons.

First, the University has a strong interest in the discipline of its employees. As this Court observed, the University must "enjoy wide latitude in managing [its] offices, without intrusive oversight by the judiciary in the name of the First Amendment."[90] That concern is more pronounced in the academic context, where the Supreme Court cautioned "care and restraint."[91]

---

[88]    *Id.*; KRS § 164.230.

[89]    *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[90]    *Patterson v. Kent State Univ.*, 155 F.4th 635, 649 (6th Cir. 2025).

[91]    *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968).

Second, the University has a legitimate interest in ensuring the enforcement of federal law. As this Court recognized, it "is in the public interest to enforce legitimate laws and regulations that implicate a matter of public importance."[92] Title VI bars racial discrimination, and the University cannot ignore a possible Title VI violation. Because the public has an "interest in the enforcement of" federal law,"[93] the University must be permitted to conduct its investigation.

Third, the University also has "a substantial interest in the fair, prompt, and accurate resolutions of disciplinary matters without undue interference from courts."[94] In essence, "this is an attempt to convert the administrative proceeding into federal litigation so the plaintiff can then leverage" these proceedings to shut down the University's investigation.[95]

---

[92] *Tennessee v. U.S. Dep't of Health & Hum. Servs.*, 720 F. Supp. 3d 564, 595 (E.D. Tenn. 2024), *aff'd sub nom. Tennessee v. Becerra*, 131 F.4th 350 (6th Cir. 2025), *vacated and remanded to dismiss as moot sub nom. Tennessee v. Kennedy*, — S.Ct. —, 2026 WL 135717 (Jan. 20, 2026).

[93] *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017).

[94] *Doe v. Transylvania Univ.*, 2020 WL 1860696, at *12 (E.D. Ky. Apr. 13, 2020).

[95] *Id.* at *13; *see also Marshall v. Ohio Univ.*, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015).

Fourth, the University should not be denied the opportunity to finish the investigation so that it may first determine what happened and then to decide how to react. Unanswered questions remain, and the full constitutional analysis should not be completed by the Court until the University has had the chance to get the answers it needs to make the evaluation it must. Then, the district court must pass on the issues before this Court is called on to do so.

Fifth, Woodcock asks this Court to upset the status quo and substantially disrupt the law school. He wants this Court to order University to add a class (international law) to the schedule, even though the semester started on January 12. Incredibly, he wants this Court to order the University to displace the professor teaching current classes such as Contracts II and allow him to teach the remainder of the semester. His requests are unfair to the students, who are more than a quarter through the semester, unfair to the professor who is teaching Contracts II and have built the curriculum already and prepared for the semester, and administratively difficult.

Finally, "without a showing of likelihood of success on the merits," Woodcock "has not demonstrated that he suffered a violation of his

constitutional rights and thus injunctive relief is not in the public interest."[96]

## CONCLUSION

For these reasons, the Court should deny Woodcock's emergency motion for an injunction pending appeal.

Respectfully submitted,

/s/ Bryan H. Beauman

| | |
|---|---|
| Bryan H. Beauman | William E. Thro |
| Carmine G. Iaccarino | *General Counsel* |
| Sturgill, Turner, Barker & Moloney, PLLC | Office of Legal Counsel |
| 333 West Vine Street, Suite 1500 | University of Kentucky |
| Lexington, Kentucky 40507 | 301 Main Building |
| Telephone: (859) 255-8581 | Lexington, Kentucky 40506 |
| BBeauman@sturgillturner.com | Telephone: (859) 257-2936 |
| Carmine@sturgillturner.com | William.Thro@uky.edu |

*Counsel for the Appellees, the University of Kentucky; Eli Capilouto, in his official and individual capacities; Robert DiPaola, in his official and individual capacities; William Eugene Thro, in his official and individual capacities; and James C. Duff, in his official and individual capacities*

---

[96] *Doe v. Univ. of Cincinnati*, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015).

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 5,184 words, excluding those parts exempted by Fed. R. App. P. 32(f).

This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using proportionally-spaced, 14-point face.

*/s/ Bryan H. Beauman*
*Counsel for the University Appellees*


## CERTIFICATE OF SERVICE

I certify that on February 3, 2026, I served a true and complete copy of this Response via the Court's CM/ECF system to all counsel of record.

*/s/Bryan H. Beauman*
*Counsel for the University Appellees*