# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

RAMSI A. WOODCOCK

*Plaintiff-Appellant*

v.

UNIVERSITY OF KENTUCKY, ELI CAPILOUTO, in his official and individual capacities; ROBERT DIPAOLA, in his official and individual capacities; WILLIAM EUGENE THRO, in his official and independent capacities; JAMES C. DUFF, in his official and individual capacities; LINDA MCMAHON, in her official capacity as United States Secretary of Education; RUSSELL MATTHEW COLEMAN, Attorney General of Kentucky

*Defendants-Appellees.*

———————————————

On Appeal from the Eastern District of Kentucky
No. 5:25-cv-424 (Reeves, J.)

———————————————

## ATTORNEY GENERAL'S RESPONSE TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

———————————————

Russell Coleman
*Attorney General*
Matthew F. Kuhn
*Solicitor General*
John H. Heyburn
*Principal Deputy Solicitor General*

Office of the Kentucky
Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION................................................................................................................ 1

STATEMENT OF THE CASE ............................................................................................ 3

ARGUMENT ....................................................................................................................... 9

CONCLUSION ................................................................................................................... 18

CERTIFICATE OF COMPLIANCE ............................................................................... 19

CERTIFICATE OF SERVICE ......................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.,*
977 F.3d 530 (6th Cir. 2020) ........................................................................ 16

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
595 U.S. 267 (2022) ........................................................................................ 6

*Chem. Weapons Working Grp. v. Dep't of the Army,*
101 F.3d 1360 (10th Cir. 1996) ...................................................................... 1

*Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin,*
498 S.W.3d 355 (Ky. 2016) ............................................................................ 6

*Doe v. Univ. of Ky.,*
860 F.3d 365 (6th Cir. 2017) .......................................................................... 9

*Josephson v. Ganzel,*
115 F.4th 771 (6th Cir. 2024) ................................................................. 14, 16

*L.W. ex rel. Williams v. Skrmetti,*
73 F.4th 408 (6th Cir. 2023) ......................................................................... 13

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021) ........................................................... 10, 13, 16

*Myers v. City of Centerville,*
41 F.4th 746 (6th Cir. 2022) ......................................................................... 11

*Peltier v. United States,*
388 F.3d 984 (6th Cir. 2004) ........................................................................ 11

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205,*
391 U.S. 563 (1968) ...................................................................................... 17

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009) ........................................................................................ 9

*Porter v. Bd. of Trs. of N.C. State Univ.,*
72 F.4th 573 (4th Cir. 2023) ................................................................... 13, 15

*Sensabaugh v. Halliburton,*
937 F.3d 621 (6th Cir. 2019) ........................................................................ 12

*Younger v. Harris*,
401 U.S. 37 (1971) ............................................................................................. 1, 6, 9

**Statutes**

2025 Ky. Acts ch. 157 ....................................................................................... 7, 8, 9

Ky. Rev. Stat. § 15.020 ......................................................................................... 6

**Other Authorities**

George Mason University Antitrust Symposium (Feb. 23, 2024),
https://www.youtube.com/watch?v=zujnq8IWEKk&t=760s ................................. 5

Ramsi Woodcock, *Statement of an American Law Professor Opposing Our Colonization of
Palestine and Commission of Genocide Therein* (Mar. 30, 2024), https://perma.cc/CV7M-
C4QT .................................................................................................................... 10

# INTRODUCTION

The Kentucky Attorney General's role in this appeal is narrow. The Attorney General intervened below to defend the constitutionality of a state law that directs Kentucky's public universities to combat the spread of antisemitism on campus. At this early juncture, the district court has not reached the constitutionality of that law—or any merits issue. The district court instead abstained under *Younger v. Harris*, 401 U.S. 37 (1971). The Attorney General leaves to the University of Kentucky and its officials (together, UK) the defense of that ruling. Ramsi Woodcock's emergency motion for an injunction pending appeal, however, goes beyond the district court's *Younger* ruling and argues that UK is violating his First Amendment rights merely by investigating him for creating a hostile environment and temporarily reassigning his duties with full pay pending that investigation.[1] Because that argument could implicate the constitutionality of Kentucky's law regarding antisemitism, the Attorney General files this response.

Kentucky adopted its law last year in response to the explosion of antisemitism on college campuses, including unfortunately in the Commonwealth, following the

---

[1] Earlier today, Woodcock filed an 18-page emergency motion to expedite the Court's ruling on his first emergency motion. This second emergency motion relies in meaningful part on new evidence contained in an unsigned declaration from Woodcock. *See Chem. Weapons Working Grp. v. Dep't of the Army*, 101 F.3d 1360, 1362 (10th Cir. 1996) ("'[T]he fundamentally different roles of appellate and trial courts mandate consideration of the new evidence by the district court under Fed. R. Civ. P. 62(c) before Rule 8 proceedings in this court."). The Attorney General will respond to Woodcock's second emergency motion in due course.

October 7, 2023 attacks on Israel. The law reports that from 2022 to 2024 there was a *200 percent increase* in reported instances of antisemitism on American college campuses. It also documents that "Jewish students are targeted for hate crimes at a higher per capita rate than students belonging to any other group." Given this intolerable state of affairs, the law directs Kentucky's public universities to "take timely action" to live up to their "obligation" to ensure that all students, including Jewish students, have the right to "access Kentucky's public postsecondary education institutions." Relevant here, the law directs Kentucky's public universities to adopt "policies to combat antisemitism" that use as "guidance" a uniform definition of antisemitism. The law simultaneously emphasizes that public universities "shall adhere to the First Amendment."

Although the First Amendment safeguards vibrant—even heated—discussions about Israel at public universities, the First Amendment does not prohibit UK from investigating Woodcock for creating a hostile environment for Jewish students and temporarily reassigning his duties with full pay during that investigation. To begin with, Woodcock has not suffered an adverse employment action—at least not yet. Based on the undisputed testimony given below, Woodcock's temporary reassignment pending investigation is UK's standard protocol when there is a claim of a hostile environment. And UK has made clear that its investigation might, or might not, clear Woodcock of wrongdoing. Even if Woodcock can show an adverse employment action, on this record, he has not established a likely violation of the First Amendment. In this emergency

posture, his arguments require substantial extensions of this Court's First Amendment caselaw on an undeveloped record. If after its investigation UK decides that Woodcock's anti-Israel speech amounted to misconduct and disciplines him, Woodcock is free to reassert his First Amendment claim then. The First Amendment, however, does not require stopping UK's ongoing hostile-environment investigation.

## STATEMENT OF THE CASE

**A.** Ramsi Woodcock is a tenured professor at UK's J. David Rosenberg College of Law. Compl., R.1, PageID#4. Last July, UK notified Woodcock that it is investigating him for, among other things, creating a hostile environment in violation of Title VI of the Civil Rights Act of 1964. Notice of Investigation, R.23-1, PageID#1306–09; *see also* Am. Notice of Investigation, R.23-3, PageID#1321–22. While that investigation is ongoing, and "[f]ollowing protocols and past practices for investigations of this nature," UK temporarily reassigned Woodcock's duties to "100% professional development." Duff Ltr., R.19-3, PageID#493. Such a reassignment, UK has explained, is a "pretty standard process when a faculty member is being investigated for something that could implicate hostile environment harassment." Trans., R.40, PageID#1954. Throughout UK's investigation, Woodcock has received his full pay and benefits. *Id.* at PageID#1851–52. And to this day, the law school's website lists Woodcock as the

Wyatt, Tarrant & Combs Professor of Law. Faculty, UK Law School, https://law.uky.edu/people/ramsi-woodcock.

UK's investigation concerns various statements Woodcock allegedly made about Israel. Notice of Investigation, R.23-1, PageID#1306–07; Am. Notice of Investigation, R.23-3, PageID#1321–22. For example, the investigation concerns Woodcock's potential use of "his official position as a University of Kentucky professor to call for violence against Israel, the genocide of the Israeli people who are predominantly Jewish, and the ultimate destruction of Israel." Am. Notice of Investigation, R.23-1, PageID#1321. UK is also investigating Woodcock for "making anti-Semitic and anti-Israeli remarks during an optional lecture . . . includ[ing] that [he] does not need to invite or include any speakers or guest lecturers with a pro-Israeli viewpoint because such speakers are pro-genocide." *Id.* at PageID#1322; *accord* Trans., R.40, PageID#1841–46 (Woodcock discussing this statement). And UK is investigating Woodcock for shouting "Free Palestine" with UK students in the car. Am. Notice of Investigation, R.23-3, PageID#1322. As Woodcock has explained, to him that statement "means bringing the state of Israel to an end." Trans., R.40, PageID#1849.

UK's investigation also includes anti-Israel remarks Woodcock made during two off-campus conferences, one about law and technology and the other about antitrust and privacy. Notice of Investigation, R.23-1, PageID#1306–07. At the latter conference, the moderator asked Woodcock a question about antitrust law and privacy.

George Mason University Antitrust Symposium, at 11:10–12:38 (Feb. 23, 2024), https://www.youtube.com/watch?v=zujnq8IWEKk&t=760s. Before answering that question, and with the recording identifying him for part of the time as a UK professor, Woodcock stated that "[b]efore answering [the moderator's question], I just want to acknowledge that we are living through a very special moment in our nation's history. Our government is currently committing genocide in Palestine through the colony we maintain called Israel. We have killed 30,000 people so far and nearly 15,000 children and that must stop." *Id.* at 12:38–13:13. After making that statement, Woodcock proceeded to answer the question posed to him. *Id.* at 13:14–16:02. Woodcock injected Israel into his antitrust remarks because "how could I possibly get up and speak about antitrust and privacy and not acknowledge that my country's committing the supreme crime of genocide through Israel." Trans., R.40, PageID#1836.

To the best of the Attorney General's knowledge, UK's investigation of Woodcock's statements remains ongoing. Before the district court, UK averred that it has not yet determined whether any of Woodcock's statements amount to misconduct. Resp. to PI Mtn., R.26, PageID#1405. As UK explained, it might conclude that some or all Woodcock's speech is protected and thus not subject to discipline. *Id.* Or alternatively,

UK might conclude that some or all of Woodcock's speech is not protected and discipline him. *Id.*

Despite UK having not completed its investigation, Woodcock sued to stop UK from merely investigating him and temporarily reassigning his duties with full pay. Compl., R.1. Woodcock wants a preemptive ruling that all his speech is protected before UK can investigate to decide for itself whether it believes the speech is protected and if not whether discipline is justified. After holding a hearing, the district court (Reeves, J.) abstained from ruling on Woodcock's case under *Younger* until UK completes its investigation and decides whether to impose discipline. Memo. Op. & Order, R.37, PageID#1771–98. In light of its *Younger* ruling, the district court declined to reach the merits of Woodcock's claims. *Id.* at PageID#1771.

**B.** In Kentucky, state universities typically retain their own counsel to represent their interests in court, as UK has done here. *See Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin*, 498 S.W.3d 355, 363–64 (Ky. 2016). That said, the Attorney General has the right to speak for the Commonwealth in a university-related case, especially when the constitutionality of a Kentucky law is at stake. *See id.* at 364; *accord Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 278 (2022) (discussing Ky. Rev. Stat. § 15.020).

Woodcock's complaint challenges the constitutionality of a recently enacted Kentucky law, 2025 Senate Joint Resolution 55 (SJR 55). Compl., R.1, PageID#3, 8–9,

38. In light of that constitutional challenge, Kentucky's Attorney General intervened below to defend SJR 55. Mtn. to Intervene, R.16; Minute Order, R.17.

That law begins by noting that "recorded incidents of antisemitism, including on Kentucky's university campuses, have reached record highs." 2025 Ky. Acts ch. 157. It instructs that "to address rising incidents of antisemitism, Kentucky's public postsecondary institutions need to take timely action." *Id.* The law required each public university in Kentucky, by January 1 of this year, to adopt policies to "combat antisemitism within their institutions that use as guidance the definition of 'antisemitism' as established by the International Holocaust Remembrance Alliance." *Id.* § 1; *accord* AG's Answer, R.18, PageID#175 (providing this definition). Although the law requires that each public university use this definition, the law also emphasizes that "the institutions shall adhere to the First Amendment." 2025 Ky. Acts ch. 157, § 1. As a result, the law

requires Kentucky's public universities to combat antisemitism consistent with the First Amendment.

SJR 55 also requires Kentucky's public universities to, among other things:

1. Notify all students at the start of each semester of their rights under Title VI and Kentucky's related laws. *Id.* § 1(1)(a)–(b).

2. Identify "all Jewish groups" that seek to serve Jewish students as "community resources" the same "as any other religious organization is recognized by the institution as a community resource." *Id.* § 1(2).

3. Defund and disband "any student organization that has been found by an institution to be providing material support or resources to a designated terrorist organization" and report such activities to law enforcement. *Id.* § 1(3).

4. Collect and report data about alleged instances of antisemitism on campus, related investigations, and related actions brought against the university. *Id.* §§ 1(4), 2.

Woodcock's complaint challenges only the part of SJR 55 that requires UK to use as "guidance" the above-described definition of antisemitism. Compl., R.1, PageID#9, 38. As Woodcock sees it, SJR 55 prohibits "broad categories of political

speech critical of Israel." *Id.* at PageID#9. His complaint fails to quote the part of SJR 55 requiring UK to "adhere to the First Amendment." 2025 Ky. Acts ch. 157, § 1.

## ARGUMENT

As summarized above, the district court did not reach the merits of Woodcock's constitutional claims. Memo. Op. & Order, R.37, PageID#1771. It abstained under *Younger* until UK completes its investigation and disciplinary process if necessary. *Id.* at PageID#1771–98. From the Attorney General's perspective, that ruling seems to follow largely from this Court's decision in *Doe v. University of Kentucky*, in which the Court affirmed a district court's abstention under *Younger* while UK completed a student-disciplinary proceeding. 860 F.3d 365, 368–71 (6th Cir. 2017). The Attorney General, however, takes no position on the *Younger* issue, given his narrow role of defending SJR 55. As to that merits issue, Woodall's emergency motion raises (at 14–19) his First Amendment retaliation claim. As a result, the constitutionality of SJR 55 is potentially at play.

At the outset, it's important to emphasize that the First Amendment in no way prohibits Kentucky's public universities from speaking out against antisemitism on campus. The government, of which state universities are a part, is not required to be neutral on such matters under the First Amendment. UK "is entitled to say what it wishes" and "to select the views that it wants to express." *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) (citation omitted). So despite Woodcock's criticisms, UK's President was well within his rights to tell the UK community that Woodcock's

statements "if accurately attributed, are *repugnant.*" *See* Capilouto Message, R.19-3, PageID#496 (emphasis added). To give one example, in online writings identifying himself as a UK law professor, Woodcock has called the October 7 attacks on Israel "legitimate." Ramsi Woodcock, *Statement of an American Law Professor Opposing Our Colonization of Palestine and Commission of Genocide Therein* (Mar. 30, 2024), https://perma.cc/CV7M-C4QT. The Commonwealth's leaders, whether UK's President or Kentucky's Attorney General, do not infringe Woodcock's rights by publicly opposing such loathsome statements.

The First Amendment, however, no doubt provides protection to Woodcock for speech related to Israel depending on the context and content. This Court's seminal decision in *Meriwether v. Hartop* instructs that "the First Amendment protects the academic speech of university professors." 992 F.3d 492, 503 (6th Cir. 2021). But that protection is not absolute. "[F]ree-speech rules apply differently when the government is doing the speaking. And that remains true even when a government employee is doing the talking." *Id.* at 503–04. So the fact that Woodcock is being investigated for speech related to Israel does not automatically violate the First Amendment.

To prevail on his First Amendment retaliation claim, Woodcock must show that: (1) he made constitutionally protected speech; (2) the government took adverse action against him that "would deter a person of ordinary firmness" from continuing to speak; and (3) the adverse action "was motivated at least in part" by his protected speech. *See*

*Myers v. City of Centerville*, 41 F.4th 746, 759 (6th Cir. 2022). At this stage, the Attorney General focuses on the first two elements.

**A.** Start first with the adverse-action prong. Everyone agrees that while UK investigates Woodcock's statements, he retains his full salary, tenure, and title. To be sure, Woodcock cannot teach or enter the law school for now. In accordance with UK's standard practice for hostile-environment investigations, he has been temporarily reassigned to only "professional development" during the investigation.[2] But Woodcock has not been disciplined in any way. Indeed, UK has made it clear that its investigation might, or might not, clear Woodcock of wrongdoing. If UK finds no wrongdoing or chooses not to impose discipline, Woodcock will return to the classroom. *See* Trans., R.40, PageID#1984.

Although Woodcock asserts that he would rather be teaching and in the law-school building, the well-established rule in this circuit is that "a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (citation omitted); *accord Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019) ("Several panels of this court have determined that a suspension with pay does not

---

[2] To the Attorney General, the obvious understanding of professional development for a university professor is pursuing research. Although Woodcock claimed otherwise at the hearing, he acknowledged that he hasn't asked for clarification from UK on this point since the investigation began last July and that "[n]obody" has told him he's not allowed to conduct research. Trans., R.40, PageID#1852–53.

constitute an adverse action."). Were the rule otherwise, government employers would be limited in their ability to temporarily remove the subject of an investigation from the potentially concerning situation pending a timely investigation. And were the rule otherwise, government employers would have to rush through an investigation lest the employee (like Woodcock has done) preemptively sue to shut down the investigation.

Woodcock's motion does not argue that UK is slow-walking its investigation. Nor could he so claim, given that he has delayed answering UK's inquiries and took some time to send his university-issued laptop to the investigator to be copied. *E.g.*, Laptop Correspondence, R.23-5, PageID#1328–36; Questions Email, R.23-6, PageID#1338–39. What's more, UK is now several weeks into the semester. Based on the Attorney General's understanding of the academic year, and in light of the undeveloped record below, it's unclear how granting Woodcock's emergency motion would allow him to begin teaching an already-started class midstream and apparently oust the existing professor. This reality supports denying Woodcock's emergency motion and expeditiously deciding the merits of this appeal before next semester (assuming UK's investigation and disciplinary process if necessary have not concluded by then).

**B.** Even if Woodcock can otherwise prove his retaliation claim in this emergency posture, he has not shown that his speech is likely protected by the First Amendment. As summarized below, at every step of the First Amendment inquiry, Woodcock's First Amendment argument raises questions that the record currently does not answer. Plus,

Woodcock's arguments seek to extend this Court's First Amendment caselaw to provide protection beyond a professor's core academic activities recognized by this Court. This Court has been clear that such extensions are not the province of a preliminary-injunction appeal. *See L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 415–16 (6th Cir. 2023). All the more so for emergency motion practice.

In this circuit, whether Woodcock's speech is protected begins with *Meriwether*. That case recognized that the classroom "is peculiarly the marketplace of ideas." *Meriwether*, 992 F.3d at 505 (citation omitted) (cleaned up). "Our nation's future," *Meriwether* emphasized, "depends upon leaders trained through wide exposure to the robust exchange of ideas—not through the authoritative compulsion of orthodox speech." *Id.* (citation omitted) (cleaned up). As a result, "professors at public universities retain First Amendment protections at least when engaged in *core academic functions*, such as teaching and scholarship." *Id.* (emphasis added). So under *Meriwether*, the threshold question is whether Woodcock was engaged in a core academic function when he spoke about Israel. *Cf. Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 583–84 (4th Cir. 2023) (finding a professor's speech unrelated to teaching and scholarship).

To be sure, the Court has applied *Meriwether* to protect certain presentations by professors at off-campus conferences. In *Josephson v. Ganzel*, a professor spoke at an off-campus event during which the panel's moderator "advised the audience" that the professor spoke in his individual capacity. 115 F.4th 771, 784 (6th Cir. 2024). On those

facts, the Court concluded that the professor did not speak as "part of his official duties." *Id.* The Court also determined that speaking on a panel about a topic that "stemmed from [the professor's] scholarship and thus related to scholarship or teaching" gave protection to the professor's speech. *Id.* at 786. Putting *Meriwether* and *Josephson* together, a professor's classroom teaching and scholarship generally receive First Amendment protection, as does on-topic speech at a conference that is within the professor's expertise.

On this record, Woodcock's alleged speech is not part of his core academic functions to nearly the same degree as in *Meriwether* and *Josephson*. Although the record is undeveloped at this early stage, it does not appear that UK is considering disciplining Woodcock for classroom speech, as was done in *Meriwether*. Indeed, Woodcock insists that he has not discussed his views about Israel in the classroom. Trans., R.40, PageID#1819. As best as the Attorney General can tell, the closest to the classroom that UK's investigation comes is Woodcock's alleged statement during an "optional lecture" that he would not invite a pro-Israel speaker because such a speaker is "pro-genocide." Am. Notice of Investigation, R.26-2, PageID#1439. But this statement arose from an internal dispute about students sending a message on a university listserv. Trans., R.40, PageID#1841–42. Woodcock has explained that his resulting statement traced to his belief that "we as faculty, particularly tenured faculty, who believe that what is going on is morally wrong have a duty to speak so that students don't get into

trouble speaking." *Id.* at PageID#1843. Woodcock's speech about this university issue is nothing like the classroom speech at issue in *Meriwether*. *See Porter*, 72 F.4th at 583–84 (finding that two "wholly internal communications" by a professor were unprotected).

As to whether UK is investigating Woodcock's scholarship, the record is largely undeveloped as well. That said, nothing in UK's notice or amended notice of investigation states that Woodcock's formal scholarship is a target of the investigation. To be sure, it is possible that UK is investigating Woodcock's anti-Israel writings given the general topics in the amended notice of investigation. *See* Am. Notice of Investigation, R.26-2, PageID#1438–39. Although Woodcock's faculty biography on the law school's website identifies him as a law-and-economics scholar, with a focus on antitrust law, and does not list any Israel-related scholarship, Woodcock has written online that, for example, the October 7 attacks on Israel were "legitimate." Even so, to conclude that this online statement by a professor who is primarily an antitrust scholar is part of his core academic functions requires expanding *Meriwether* in this emergency posture.

*Josephson* does not help Woodcock either, even though UK is investigating Woodcock's statements at two conferences. The professor in *Josephson* was invited to speak about a given topic within his expertise, and he did so. As the Court emphasized, the professor's panel remarks "were on a topic he taught and wrote about as a child-psychiatry expert." *Josephson*, 115 F.4th at 786. Plus, the moderator made clear that the professor was speaking in his individual capacity. *Id.* at 784. On this record, Woodcock's

anti-Israel statements at conferences differ in material respects. Woodcock admits that the panels were about antitrust law, not about Israel. Trans., R.40, PageID#1835, 1838–39. Indeed, watching the recorded remarks discussed above shows just how jarringly irrelevant Woodcock's anti-Israel statements were. And Woodcock admits that he did not say at either conference that he was speaking in his individual capacity. *Id.* at PageID#1879. In fact, during part of the recording of Woodcock's remarks, the video identifies him as a UK professor. So while Woodcock is in fact being investigated for statements at conferences, the similarities to *Josephson* end there. Put simply, *Josephson* does not extend First Amendment protection to Woodcock's irrelevant anti-Israel remarks at antitrust conferences.

Even if Woodcock has shown a likelihood that some of his speech is protected under *Meriwether* and *Josephson*, that does not end the constitutional inquiry. Woodcock must also show a likelihood of success under *Pickering* balancing—that is, that his interest in speaking outweighs UK's interests in "promoting the efficiency of the public services it performs through him." *See Meriwether*, 992 F.3d at 508 (citation omitted) (cleaned up). In a merits appeal after trial, *Pickering* balancing can be a fraught exercise. *See Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 553 (6th Cir. 2020) (Murphy, J., concurring in the judgment). This difficulty is necessarily magnified in this emergency posture on a limited record in which UK hasn't even decided whether to discipline Woodcock. That is to say, Woodcock's ability to show likely success in this

emergency posture must overcome the reality that the Supreme Court has refused "to lay down a general standard against which all such statements may be judged" under *Pickering. Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 569 (1968).

Woodcock cannot get close to prevailing under *Pickering*. While UK gathers the facts, it has a substantial interest in efficient operations in the interim. *See Connick v. Myers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."). A temporary reassignment with pay is UK's standard protocol while it investigates whether a hostile environment exists. *See* Trans., R.40, PageID#1954, 1972–73. The UK Dean testified without contradiction that this interim measure is "for [Woodcock's] own benefit and those of the students based on allegations that have been made." *Id.* at PageID#1970. The UK Dean added that temporary reassignment was necessary "because we do live in a pretty volatile time." *Id.* at PageID#1973. It does not take any imagination to understand how disruptive—even fear inducing—it could be, especially for Jewish students, for Woodcock (as UK is investigating) to "call[] for violence against Israel, the genocide of Israeli people who are predominantly Jewish, and the ultimate destruction of Israel." Am. Notice of Investigation, R.26-2, PageID#1438. Putting everything together, Woodcock cannot show a likelihood of success under *Pickering* in this emergency posture.

**CONCLUSION**

If the Court reaches the merits of Woodcock's First Amendment claim, the

Court should deny Woodcock's emergency motion.

Respectfully submitted by,

*s/ Matthew F. Kuhn*
Russell Coleman
 *Attorney General*
Matthew F. Kuhn
 *Solicitor General*
John H. Heyburn
 *Principal Deputy Solicitor General*
Office of Kentucky Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for the Kentucky Attorney General*

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32, I certify that this response complies with the type-volume limitation in Fed. R. App. P. 27(d)(2)(A) because it contains 4,050 words, excluding the parts of the response exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(f). This response also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*s/ Matthew F. Kuhn*

**CERTIFICATE OF SERVICE**

I certify that on February 3, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Matthew F. Kuhn*