# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

RAMSI A. WOODCOCK

*Plaintiff-Appellant*

v.

UNIVERSITY OF KENTUCKY, ELI CAPILOUTO, in his official and individual capacities; ROBERT DIPAOLA, in his official and individual capacities; WILLIAM EUGENE THRO, in his official and individual capacities; JAMES C. DUFF, in his official and individual capacities; LINDA MCMAHON, in her official capacity as United States Secretary of Education; RUSSELL MATTHEW COLEMAN, Attorney General

*Defendants-Appellees*

---

On Appeal from the Eastern District of Kentucky
No. 5:25-cv-424 (Reeves, J.)

---

## ATTORNEY GENERAL RUSSELL COLEMAN'S
## APPELLEE BRIEF

Russell Colemans
 *Attorney General*
Matthew F. Kuhn
 *Solicitor General*
John H. Heyburn
 *Principal Deputy Solicitor General*

Office of the Kentucky
Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

STATEMENT REGARDING ORAL ARGUMENT .................................................... v

STATEMENT OF JURISDICTION ........................................................................... 1

STATEMENT OF ISSUES .......................................................................................... 1

INTRODUCTION......................................................................................................... 2

STATEMENT OF THE CASE .................................................................................... 4

SUMMARY OF ARGUMENT .................................................................................... 11

STANDARD OF REVIEW........................................................................................... 12

ARGUMENT ................................................................................................................. 12

   I. Woodcock has not established a likelihood of success on the merits of his First Amendment retaliation claim. ................................................................................ 15

CONCLUSION ............................................................................................................. 31

CERTIFICATE OF COMPLIANCE ......................................................................... 33

CERTIFICATE OF SERVICE .................................................................................... 34

ADDENDUM................................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Cnty. Comm'rs v. Umbehr,*
518 U.S. 668 (1996)........................................................................................29

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.,*
977 F.3d 530 (6th Cir. 2020).....................................................................25, 28

*Bilyeu v. UT-Battelle, LLC,*
154 F.4th 396 (6th Cir. 2025) ......................................................................19

*Blick v. Ann Arbor Pub. Sch. Dist.,*
105 F.4th 868 (6th Cir. 2024) ......................................................................19

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
595 U.S. 267 (2022)..........................................................................................8

*Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin,*
498 S.W.3d 355 (Ky. 2016) .............................................................................8

*Connick v. Myers,*
461 U.S. 138 (1983)....................................................................................26, 29

*Doe v. Lee,*
137 F.4th 569 (6th Cir. 2025) ......................................................................13

*Doe v. Univ. of Ky.,*
860 F.3d 365 (6th Cir. 2017)..........................................................................13

*Ehrlich v. Kovack,*
710 Fed. App'x 646 (6th Cir. 2017) .............................................................17

*Harris v. Detroit Public Schs.,*
245 Fed. App'x 437 (6th Cir. 2007) .............................................................17

*Island Creek Coal Co. v. Maynard on behalf of Maynard,*
87 F.4th 802 (6th Cir. 2023) ........................................................................14

*Jones v. Coleman,*
848 F.3d 744 (6th Cir. 2017)............................................................................1

*Josephson v. Ganzel,*
115 F.4th 771 (6th Cir. 2024) ....................................................................21, 25

*Kyrkanides v. Kluemper,*
No. 5:21-cv-00270, 2026 WL 766491 (E.D. Ky. Mar. 18, 2026), *appeal pending* No. 26-5336 (6th Cir.) ....................................................................................22

*L.W. ex rel. Williams v. Skrmetti,*
83 F.4th 460 (6th Cir. 2023) ...............................................................19, 20

*Laster v. City of Kalamazoo,*
746 F.3d 714 (6th Cir. 2014) ...................................................................19

*Malick v. Croswell-Lexington Dist. Schs.,*
148 F.4th 855 (6th Cir. 2025) ...................................................................27

*McPherson v. Kelsey,*
125 F.3d 989 (6th Cir. 1997)...............................................................14, 15

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021).............................................................. *passim*

*Muldrow v. City of St. Louis,*
601 U.S. 346 (2024)........................................................................11, 18, 19

*Myers v. City of Centerville,*
41 F.4th 746 (6th Cir. 2022) ....................................................................17

*N.E. Ohio Coal. for the Homeless v. Husted,*
831 F.3d 686 (6th Cir. 2016).....................................................................20

*Northland Ins. Co v. Stewart Title Guar. Co.,*
327 F.3d 448 (6th Cir. 2003)......................................................................14

*Patterson v. Kent State Univ.,*
155 F.4th 635 (6th Cir. 2025) ...................................................................29

*Platt v. Bd. of Comm'rs on Grievance & Discipline of Ohio Supreme Ct.,*
769 F.3d 447 (6th Cir. 2014).....................................................................12

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009)..................................................................................15

*Porter v. Bd. of Trs. of N.C. State Univ.,*
72 F.4th 573 (4th Cir. 2023) ...............................................................21, 22

*Sensabaugh v. Halliburton,*
937 F.3d 621 (6th Cir. 2019).....................................................................17

*Thompson v. DeWine*,
976 F.3d 610 (6th Cir. 2020)..................................................................................... 29

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021)..................................................................................................... 30

*Younger v. Harris*,
401 U.S. 37 (1971)................................................................................................ *passim*

## Statutes

2025 Ky. Acts ch. 157 ..........................................................................................8, 10, 30

28 U.S.C. § 1291 ........................................................................................................... 1

28 U.S.C. § 1292 ........................................................................................................... 1

28 U.S.C. § 1331 ........................................................................................................... 1

28 U.S.C. § 1343 ........................................................................................................... 1

Ky. Rev. Stat. § 15.020 ................................................................................................. 8

## Other Authorities

Exec. Order No. 13899, 84 Fed. Reg. 68,779 (Dec. 11, 2019) ...................................9, 31

Exec. Order No. 14188, 90 Fed. Reg. 8,847 (Jan. 29, 2025) ........................................... 9

Faculty, UK Law School, https://law.uky.edu/people/ramsi-woodcock ...................... 4

George Mason University Antitrust Symposium (Feb. 23, 2024),
https://www.youtube.com/watch?v=zujnq8IWEKk&t=760s................................... 5

Ramsi Woodcock, *Statement of an American Law Professor Opposing Our Colonization of
Palestine and Commission of Genocide Therein* (Mar. 30, 2024), https://perma.cc/CV7M-
C4QT........................................................................................................................ 16

Use of the Working Definition in the U.S., American Jewish Committee,
https://perma.cc/PRT6-QZCQ ................................................................................ 9

## STATEMENT REGARDING ORAL ARGUMENT

This appeal primarily concerns whether the district court properly abstained under *Younger*. The Attorney General takes no position on that issue and thus takes no position on whether oral argument is warranted as to it. If the Court reaches the merits of Woodcock's motion for a preliminary injunction, the Attorney General submits that oral argument would be useful.

## STATEMENT OF JURISDICTION

Ramsi Woodcock sued alleging violations of the federal Constitution under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4). Compl., R.1, PageID#4. On January 8, 2026, the district court abstained from ruling under *Younger*. Memo. Op. & Order, R.37, PageID#1758. Because of its abstention holding, the district court denied Woodcock's motion for a preliminary injunction. *Id.* at PageID#1798. On January 21, 2026, Woodcock timely appealed the district court's abstention ruling under 28 U.S.C. § 1291 and the district court's denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1). Notice of Appeal, R.44, PageID#2123. Under this Court's precedent, "orders of abstention are considered final judgments." *Jones v. Coleman*, 848 F.3d 744, 748 (6th Cir. 2017).

## STATEMENT OF ISSUES

The issues presented on appeal are: (i) whether the district court properly abstained; (ii) if not, whether the Court should consider the merits of Woodcock's claims in the first instance; and (iii) if so, whether Woodcock is entitled to a preliminary injunction.

# INTRODUCTION

The Kentucky Attorney General's role in this appeal is narrow. The Attorney General intervened below to defend the constitutionality of a state law that requires Kentucky's public universities to combat the spread of antisemitism on campus. At this early juncture, the district court has not reached the constitutionality of that law—or any merits issue. The district court instead abstained under *Younger v. Harris*, 401 U.S. 37 (1971). The Attorney General leaves to the University of Kentucky and its officials (together, UK) the defense of that ruling. Woodcock's brief, however, attempts to go beyond the district court's *Younger* holding. He argues in passing that UK is violating his First Amendment rights merely by investigating him for creating a hostile environment and temporarily reassigning his duties with full pay pending that investigation. Because that argument could implicate the constitutionality of Kentucky's law, the Attorney General submits this brief in defense of that law.

Kentucky adopted its law last year in response to the explosion of antisemitism on college campuses, including unfortunately in the Commonwealth, following the October 7, 2023 attacks on Israel. The law reports that from 2022 to 2024 there was a 200 percent increase in reported instances of antisemitism on American college campuses. It also documents that "Jewish students are targeted for hate crimes at a higher per capita rate than students belonging to any other group." Given this intolerable state of affairs, the law directs Kentucky's public universities to "take timely action" to live up

to their "obligation" to ensure that all students, including Jewish ones, have the right to "access Kentucky's public postsecondary education institutions." Relevant here, the law requires Kentucky's public universities to adopt "policies to combat antisemitism" that use as "guidance" a uniform definition of antisemitism. The law simultaneously emphasizes that public universities "shall adhere to the First Amendment."

Although the First Amendment safeguards vibrant—even heated—discussions about Israel at public universities, the First Amendment does not prohibit UK from investigating Woodcock for creating a hostile environment and temporarily reassigning his duties with full pay during that investigation. To begin with, Woodcock has not suffered an adverse employment action—at least not yet. Based on the undisputed testimony given below, Woodcock's temporary reassignment pending investigation is UK's standard protocol when there is a claim of a hostile environment. And UK has made clear that its investigation might, or might not, clear Woodcock of wrongdoing. Even if Woodcock can show an adverse employment action, he has not established a likely violation of the First Amendment. His arguments require substantial and unjustified extensions of this Court's First Amendment caselaw to speech outside a professor's core academic activities. If after its investigation UK decides that Woodcock's speech amounts to misconduct and disciplines him, Woodcock is free to reassert his First Amendment claim then. The First Amendment, however, does not require stopping UK's ongoing investigation.

**STATEMENT OF THE CASE**

**A.** Ramsi Woodcock is a tenured professor at UK's J. David Rosenberg College of Law. Compl., R.1, PageID#4. Last July, UK notified Woodcock that it is investigating him for, among other things, creating a hostile environment in violation of Title VI of the Civil Rights Act of 1964. Notice of Investigation, R.23-1, PageID#1306–09; *see also* Am. Notice of Investigation, R.23-3, PageID#1321–22. While that investigation is ongoing, and "[f]ollowing protocols and past practices for investigations of this nature," UK temporarily reassigned Woodcock's duties to "100% professional development." Duff Ltr., R.19-3, PageID#493. Such a reassignment, UK has explained, is a "pretty standard process when a faculty member is being investigated for something that could implicate hostile environment harassment." Trans., R.40, PageID#1954. Throughout UK's investigation, Woodcock continues to receive his full pay and benefits. *Id.* at PageID#1851–52. To this day, the law school's website lists Woodcock as a professor. Faculty, UK Law School, https://law.uky.edu/people/ramsi-woodcock.

UK's investigation concerns various statements Woodcock allegedly made about Israel. Notice of Investigation, R.23-1, PageID#1306–07; Am. Notice of Investigation, R.23-3, PageID#1321–22. For example, the investigation concerns Woodcock's potential use of "his official position as a University of Kentucky professor to call for violence against Israel, the genocide of the Israeli people who are predominantly Jewish, and the ultimate destruction of Israel." Am. Notice of Investigation, R.23-3, PageID#1321. UK

is also investigating Woodcock for "making anti-Semitic and anti-Israeli remarks during an optional lecture . . . includ[ing] that [he] does not need to invite or include any speakers or guest lecturers with a pro-Israeli viewpoint because such speakers are pro-genocide." *Id.* at PageID#1322; *accord* Trans., R.40, PageID#1841–46 (Woodcock discussing this statement). UK's investigation also concerns Woodcock allegedly shouting "Free Palestine" with UK students in the car. Am. Notice of Investigation, R.23-3, PageID#1322. As Woodcock admits, to him that statement "means bringing the state of Israel to an end." Trans., R.40, PageID#1849. UK is also considering Woodcock allegedly "spamm[ing]" his personal views to listservs to which he has access as a university professor and allegedly using UK's resources to circulate an online petition called "Petition for Military Action Against Israel." Notice of Investigation, R.23-1, PageID#1307.

UK's investigation also includes Israel-related remarks Woodcock made during two off-campus conferences, one about law and technology and the other about antitrust and privacy. Notice of Investigation, R.23-1, PageID#1306–07. At the latter conference, the moderator asked Woodcock a question about antitrust law and privacy. George Mason University Antitrust Symposium, at 11:10–12:38 (Feb. 23, 2024), https://www.youtube.com/watch?v=zujnq8IWEKk&t=760s. Before answering that question, and with the recording identifying him for part of the time as a UK professor, Woodcock stated that "[b]efore answering [the moderator's question], I just want to

acknowledge that we are living through a very special moment in our nation's history. Our government is currently committing genocide in Palestine through the colony we maintain called Israel. We have killed 30,000 people so far and nearly 15,000 children and that must stop." *Id.* at 12:38–13:13. After making this statement, Woodcock proceeded to answer the question posed to him. *Id.* at 13:14–16:02. Woodcock injected Israel into his antitrust remarks because "how could I possibly get up and speak about antitrust and privacy and not acknowledge that my country's committing the supreme crime of genocide through Israel." Trans., R.40, PageID#1836.

To the best of the Attorney General's knowledge, UK's investigation of Woodcock remains ongoing. Before the district court, UK averred that it has not determined whether any of Woodcock's statements amount to misconduct. Resp. to PI Mtn., R.26, PageID#1405. As UK explained, it might conclude that some or all Woodcock's speech is protected and thus not subject to discipline. *Id.* Or UK might conclude that some or all of Woodcock's speech is not protected and discipline him. *Id.* As the Attorney General understands it, UK has not yet completed its investigation because so far Woodcock has refused to participate in it. In fact, Woodcock's brief admits (at 28) that he will not respond to UK's written questions as part of its investigation "until two weeks after the conclusion of [this] appeal." *See also* Thompson Decl., CA6 Dkt. 40-2, at 2–4. As a

6

result, the continued pendency of UK's investigation is by all appearances Woodcock's fault.

**B.** Despite UK not having completed its investigation, Woodcock sued to stop the university from merely investigating him and temporarily reassigning his duties with full pay. Compl., R.1. Woodcock wants a preemptive ruling that all his speech is protected before UK can investigate to decide for itself whether it believes the speech is protected and if not whether discipline is justified. After holding an evidentiary hearing, the district court (Reeves, J.) abstained from ruling on this case under *Younger* until UK completes its investigation and decides whether to impose discipline. Memo. Op. & Order, R.37, PageID#1771–98. In light of its *Younger* ruling, the district court declined to reach the merits of Woodcock's claims. *Id.* at PageID#1771.

Woodcock appealed and sought an emergency injunction pending appeal. A motion panel denied relief because "none" of the injunction factors "weigh in favor of relief." CA6 Dkt. 37 at 2. The panel determined that "Woodcock has not—at least on the arguments properly raised and developed in his [injunction] motion—shown that the district court improperly abstained." *Id.* at 3. In light of that conclusion, the motion panel "decline[d] to review [Woodcock's] remaining arguments regarding his likelihood of success on his First Amendment and due process claims." *Id.* In addition, the panel

rejected Woodcock's attempt to incorporate by reference arguments in his injunction motion that he made in another filing. *Id.* at 4.

**C.** On paper, this case is between Woodcock and UK. And in Kentucky, state universities typically retain their own counsel to represent their interests in court, as UK has done here. *See Commonwealth ex rel. Beshear v. Commonwealth Off. of the Governor ex rel. Bevin*, 498 S.W.3d 355, 363–64 (Ky. 2016). That said, the Kentucky Attorney General has the right to speak for the Commonwealth in a university-related case, especially when the constitutionality of a Kentucky law is at stake. *See id.* at 364; *accord Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 278 (2022) (discussing Ky. Rev. Stat. § 15.020).

Woodcock's complaint challenges the constitutionality of a recently enacted Kentucky law: 2025 Senate Joint Resolution 55 (SJR 55). Compl., R.1, PageID#3, 8–9, 38. In light of that constitutional challenge, Kentucky's Attorney General intervened below to defend SJR 55. Mtn. to Intervene, R.16; Minute Order, R.17.

SJR 55 begins by noting that "recorded incidents of antisemitism, including on Kentucky's university campuses, have reached record highs." 2025 Ky. Acts ch. 157. It instructs that "to address rising incidents of antisemitism, Kentucky's public postsecondary institutions need to take timely action." *Id.* The law required each public university in Kentucky, by January 1 of this year, to adopt policies to "combat antisemitism within their institutions that use as guidance the definition of 'antisemitism' as

established by the International Holocaust Remembrance Alliance," or IHRA.[1] *Id.* § 1. In compliance with SJR 55, UK adopted IHRA's definition of antisemitism through its Office of Equal Opportunity. Compl., R.1, PageID#8. The IHRA definition provides that "[a]ntisemitism is a certain perception of Jews which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community in-stitutions and religious facilities." IHRA Definition, R.18-1, PageID#179. IHRA's def-inition also lists "[c]ontemporary examples of antisemitism" while emphasizing that "criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic." *Id.* at PageID#179, 180. SJR 55 similarly states that in using IHRA's definition as "guidance" "the institutions shall adhere to the First Amendment." 2025

---

[1] Kentucky is far from alone in relying on IHRA's definition of antisemitism. Federal agencies must also "consider" it in enforcing Title VI of the Civil Rights Act of 1964. Exec. Order No. 13899, 84 Fed. Reg. 68,779, 68,779 (Dec. 11, 2019); *see also* Exec. Order No. 14188, 90 Fed. Reg. 8,847, 8,847 (Jan. 29, 2025). And many States and lo-calities use IHRA's definition as well. Use of the Working Definition in the U.S., Amer-ican Jewish Committee, https://perma.cc/PRT6-QZCQ.

Ky. Acts ch. 157, § 1. As a result, the law requires Kentucky's public universities to combat antisemitism consistent with the First Amendment.

SJR 55 also requires Kentucky's public universities to, among other things:

1. Notify all students at the start of each semester of their rights under Title VI and Kentucky's related laws. *Id.* § 1(1)(a)–(b).

2. Identify "all Jewish groups" that seek to serve Jewish students as "community resources" the same "as any other religious organization is recognized by the institution as a community resource." *Id.* § 1(2).

3. Defund and disband "any student organization that has been found by an institution to be providing material support or resources to a designated terrorist organization" and report such activities to law enforcement. *Id.* § 1(3).

4. Collect and report data about alleged instances of antisemitism on campus, related investigations, and related actions brought against the university. *Id.* §§ 1(4), 2.

Woodcock's complaint challenges only the part of SJR 55 that requires UK to use as "guidance" the IHRA definition of antisemitism. Compl., R.1, PageID#9, 38. In Woodcock's view, SJR 55 prohibits "broad categories of political speech critical of Israel." *Id.* at PageID#9. His complaint, however, fails to quote the part of SJR 55 requiring UK to "adhere to the First Amendment." 2025 Ky. Acts ch. 157, § 1. Nor does his complaint mention the part of IHRA's definition explaining that "criticism of Israel

similar to that leveled against any other country cannot be regarded as antisemitic." IHRA Definition, R.18-1, PageID#179.

## SUMMARY OF ARGUMENT

This appeal primarily concerns whether the district court properly abstained under *Younger* until UK completes its investigation and decides whether to discipline Woodcock. On that issue, the Attorney General takes no position. His only interest in this appeal is defending Kentucky's law requiring public universities to combat antisemitism on campus. Although Woodcock's brief suggests (at 67–69) that UK has violated his First Amendment rights, the Court need not reach that issue now. If the Court disagrees with the district court's *Younger* holding, the proper course is to remand to allow the district court to consider Woodcock's First Amendment retaliation claim in the first instance. Woodcock's attempt (at 67) to incorporate by reference his prior arguments on his First Amendment claim does not suffice.

If the Court nevertheless considers Woodcock's First Amendment claim, it should conclude that he has not established a likelihood of success. For one thing, Woodcock has not yet suffered an adverse action. He has simply been temporarily reassigned with full pay during UK's investigation. Under circuit precedent, that temporary change in duties does not qualify as an adverse action. Woodcock's reliance on the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), does

not change matters. *Muldrow* is distinguishable on its facts and turned on statutory text not at issue here.

On this record, Woodcock also has not established that the First Amendment likely protects some or all of the speech that UK is investigating. Although in this circuit the First Amendment protects a professor's core academic activities, the record in this matter does not establish that UK is investigating Woodcock's classroom teaching or his formal scholarship, especially because Woodcock is primarily a law-and-economics and antitrust scholar. Even if the Court disagrees, UK has a substantial interest in temporarily reassigning Woodcock's duties to give itself time to complete its investigation without risking harm to students in the meantime. Under *Pickering* balancing, UK's interest in this regard easily outweighs Woodcock's interest in speaking.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for an abuse of discretion, with the question of the plaintiff's likelihood of success on the merits receiving de novo review. *Platt v. Bd. of Comm'rs on Grievance & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 454 (6th Cir. 2014).

## ARGUMENT

As noted above, the district court did not reach the merits of Woodcock's constitutional claims. Memo. Op. & Order, R.37, PageID#1771. It instead abstained under *Younger* until UK completes its investigation and disciplinary process if necessary. *Id.* at

PageID#1771–98. From the Attorney General's perspective, that ruling seems to follow largely from this Court's decision in *Doe v. University of Kentucky*, in which the Court affirmed a district court's abstention under *Younger* while the university completed a student-disciplinary proceeding. 860 F.3d 365, 368–71 (6th Cir. 2017). That said, in light of Attorney General's narrow role of defending SJR 55, he leaves the *Younger* issue to UK and Woodcock to litigate.[2]

If the Court agrees with Woodcock that the district court improperly abstained, the question becomes whether the Court should remand this matter or consider the merits of Woodcock's motion for a preliminary injunction in the first instance. Although the Court has discretion as to which path to take, the better course is to remand for the district court to take the first pass. This is so for two reasons. First, this Court is "a court of review, not first view." *Doe v. Lee*, 137 F.4th 569, 579 n.2 (6th Cir. 2025) (citation omitted). Although the district court held a lengthy evidentiary hearing before abstaining, Trans., R.40, the court has not yet considered the many factual issues that could bear on Woodcock's request for a preliminary injunction. As explained below, the context in which Woodcock made his alleged statements very much matters to the First Amendment analysis. The Court would benefit from giving the district court the

---

[2] The only position that the Attorney General takes on *Younger* is that its flagrant-unconstitutionality exception has not been met. This exception requires Woodcock to show that SJR 55 is facially unconstitutional. *See Univ. of Ky.*, 860 F.3d at 371. For the reasons that follow, Woodcock cannot meet that "high bar." *See id.*

first chance to consider this context-driven inquiry. And there's no suggestion that the district court would tarry on remand, given that the court moved expeditiously during the first go-round. *Compare* Compl., R.1 (filed Nov. 13, 2025), *with* Memo. Op. & Order, R.37 (rendered Jan. 8, 2026).

The second reason not to reach the merits in the first instance is that Woodcock did not meaningfully argue them in his brief. CA6 Dkt. 50 at 67–69. His brief didn't even list (at 16) his First Amendment retaliation claim as an issue presented for review. Rather than substantively argue the merits, Woodcock mostly incorporates by reference (at 67) the merits arguments that the parties made in previous filings, both in this Court and below. But as the motion panel already reminded Woodcock, a filing cannot incorporate arguments made elsewhere to skirt the word-count requirement. *See* CA6 Dkt. 37 at 4 (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). This Court has rightly rejected an attempt to incorporate district court filings as part of an appellate brief. *Northland Ins. Co v. Stewart Title Guar. Co.*, 327 F.3d 448, 453 (6th Cir. 2003). The same should hold for Woodcock's attempt to incorporate by reference earlier filings in this appeal. *See Island Creek Coal Co. v. Maynard on behalf of Maynard*, 87 F.4th 802, 814–15 (6th Cir. 2023) (extending *Northland Insurance*'s rule to arguments made in an administrative proceeding). After all, the appellate rules required Woodcock's brief to include in the argument his "contentions and the reasons for them." Fed. R. App. P. 28(a)(8)(A). He didn't do that. And more generally, "issues adverted to in a perfunctory manner,

14

unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson*, 125 F.3d at 995 (cleaned up) (citation omitted). For these reasons, even if Woodcock prevails under *Younger*, the Court should remand to the district court with instructions to decide Woodcock's motion for a preliminary injunction.

## I.     Woodcock has not established a likelihood of success on the merits of his First Amendment retaliation claim.

If the Court opts to consider in the first instance whether a preliminary injunction should issue, it should hold that Woodcock has not established a likelihood of success on his First Amendment retaliation claim.

At the outset, it's important to emphasize that the First Amendment in no way prohibits Kentucky's public universities from speaking out against antisemitism on campus. The government, of which state universities are a part, is not required to be neutral on such matters under the First Amendment. UK "is entitled to say what it wishes" and "to select the views that it wants to express." *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) (citation omitted). So despite Woodcock's criticisms, UK's President was well within his rights to tell the UK community that Woodcock's statements "if accurately attributed, are *repugnant*." *See* Capilouto Message, R.19-3, PageID#496 (emphasis added). To give one example, in an online writing identifying himself as a UK law professor, Woodcock called the October 7 attacks on Israel "legitimate." Ramsi Woodcock, *Statement of an American Law Professor Opposing Our Colonization of Palestine and Commission of Genocide Therein* (Mar. 30, 2024), https://perma.cc/CV7M-

C4QT. Woodcock is also alleged to have used his university position to call for "the genocide of Israeli people who are predominantly Jewish." Am. Notice of Investigation, R.23-3, PageID#1321. The Commonwealth's leaders, whether UK's President or Kentucky's Attorney General, do not infringe Woodcock's First Amendment rights by publicly criticizing such loathsome statements.

To be sure, the First Amendment no doubt provides protection to Woodcock's speech as a university professor. This Court's decision in *Meriwether v. Hartop* instructs that "the First Amendment protects the academic speech of university professors." 992 F.3d 492, 503 (6th Cir. 2021). But that protection is not unlimited. In other words, Woodcock's status as a UK professor does not immunize everything he says or writes. *Meriwether*'s rule is more modest: "[P]rofessors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." *Id.* at 505. So the fact that Woodcock is being investigated for speech related to Israel does not automatically violate the First Amendment.

To prevail on his First Amendment retaliation claim, Woodcock must show that: (1) he made constitutionally protected speech; (2) the government took adverse action against him that "would deter a person of ordinary firmness" from continuing to speak; and (3) the adverse action "was motivated at least in part" by his protected speech. *See*

*Myers v. City of Centerville*, 41 F.4th 746, 759 (6th Cir. 2022). At this stage, the Attorney General focuses on the first two elements.[3]

**A.** Start with the adverse-action prong. Everyone agrees that while UK investigates Woodcock's actions, he retains his salary, benefits, and tenure. As Woodcock points out, he cannot teach or enter the law school for now. In accordance with UK's standard practice for hostile-environment investigations, he has been temporarily reassigned to only professional development during the investigation. But Woodcock has not been disciplined in any way. Indeed, UK has made clear that its investigation might, or might not, clear Woodcock of wrongdoing. If UK finds no wrongdoing or chooses not to impose discipline, Woodcock will return to the classroom. *See* Trans., R.40, PageID#1984.

Although Woodcock claims that he would rather be teaching and in the law-school building, the rule in this circuit is that "a suspension with pay does not constitute an adverse action." *Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019). This rule applies to First Amendment retaliation claims. *Id.* at 628–29; *Harris v. Detroit Pub. Schs.*, 245 Fed. App'x 437, 443 (6th Cir. 2007); *Ehrlich v. Kovack*, 710 Fed. App'x 646, 650 (6th Cir. 2017). Were the rule otherwise, government employers would be limited in their

---

[3] This focus should not be taken as a concession on the third element. The limited record conveys that UK's interim actions were motivated not by the content of Woodcock's speech but by UK's standard protocol for hostile-environment investigations. *See* Trans., R.40, PageID#1954. As noted above, UK has not yet decided whether some or all of Woodcock's speech is protected.

ability to temporarily remove the subject of an investigation from the potentially concerning situation pending a timely investigation. And were the rule otherwise, government employers would face pressure to rush through an investigation lest the employee preemptively sue to shut it down.

Woodcock does not, and cannot, argue that UK is slow-walking its investigation such that his temporary reassignment of duties with pay is effectively an adverse action. In fact, Woodcock acknowledges (at 28) that he will not answer UK's inquiries until after the Court resolves this appeal. For reference, UK first sent Woodcock its list of questions on December 1, 2025—over four months ago. Thompson Ltr., R.23-6, PageID#1345–53. Yet to this day, Woodcock still has not responded. *See* Thompson Decl., CA6 Dkt. 40-2, at 2–4. This, then, is not a case in which the government's prolonged and unexplained delay turns an interim reassignment of duties with pay into something more. As the Attorney General understands it, once Woodcock finally responds to UK's questions, the university will timely complete its investigation and decide whether to discipline him. In short, any delay is Woodcock's fault alone.

In prior filings, Woodcock has argued that the U.S. Supreme Court abrogated this Court's caselaw about interim suspensions with pay not being an adverse action in *Muldrow*. But *Muldrow* did not undermine this Court's settled caselaw, especially in the context of a First Amendment retaliation claim. *Muldrow* interpreted Title VII's language—statutory text not at issue here. 601 U.S. at 354–58. As this Court has explained,

*Muldrow*'s "reasoning stems from the text of Title VII." *Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 404 (6th Cir. 2025). The Court should not import *Muldrow*'s text-driven reasoning into the First Amendment context. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484–85 (6th Cir. 2023), *aff'd on other grounds sub nom. United States v. Skrmetti*, 605 U.S. 495, 519–22 (2025) (declining to apply a Title VII precedent in a constitutional case because the decision's "text-driven reasoning applies only to Title VII"); *Laster v. City of Kalamazoo*, 746 F.3d 714, 718–19 (6th Cir. 2014) (differentiating a First Amendment retaliation claim from a Title VII retaliation claim).

Aside from the textual differences between Title VII and the First Amendment, *Muldrow* is also distinguishable on its facts.[4] The plaintiff in *Muldrow* was permanently reassigned to a new position—a position "in which she was less involved in high-visibility matters and primarily performed administrative work." 601 U.S. at 351, 359. Here, by contrast, Woodcock's retains his full pay, benefits, and tenure and can spend all his time on professional development—*i.e.*, research and writing.[5] Understood this way, his current status is not all that different from a sabbatical. Given these differences between

---

[4] The Court has not resolved this issue but has considered it in dicta in the Title VII context. *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885–86 (6th Cir. 2024).

[5] To the Attorney General, the obvious understanding of professional development for a university professor is research and writing. Although Woodcock claimed otherwise at the hearing below, he acknowledged that he hasn't asked for clarification from UK since the investigation began last July and that "[n]obody" has told him he's not allowed to conduct research. Trans., R.40, PageID#1852–53. In fact, Woodcock recently alerted the Court that he has an article prepared for publication. Woodcock Decl., CA6 Dkt. 13-2, at 6–7.

the *Muldrow* plaintiff and Woodcock, *Muldrow*'s reasoning is not "directly applicable," which means that this Court's precedent on interim suspensions with pay remains intact. *See N.E. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720–21 (6th Cir. 2016) (discussing this Court's rule for when an intervening Supreme Court decision abrogates circuit precedent).

**B.** Even if Woodcock can otherwise prove his retaliation claim, he has not shown that his alleged speech is likely protected by the First Amendment. As summarized below, at every step of the First Amendment inquiry, Woodcock's position raises questions that the record currently does not answer. More importantly, Woodcock's arguments require substantial extensions of this Court's First Amendment caselaw to provide protection beyond a professor's core academic activities. Such extensions are not required by the First Amendment, especially in the context of this preliminary-injunction appeal. *See L.W.*, 73 F.4th at 415 (holding that "seek[ing] to extend the constitutional guarantees to new territory" "suggest[s] that the key premise of a preliminary injunction—likelihood of success on the merits—is missing").

In this circuit, whether Woodcock's speech is protected begins with *Meriwether*. That case recognized that the classroom "is peculiarly the marketplace of ideas." *Meriwether*, 992 F.3d at 505 (cleaned up) (citation omitted). "Our nation's future," *Meriwether* emphasized, "depends upon leaders trained through wide exposure to the robust exchange of ideas—not through the authoritative compulsion of orthodox speech." *Id.*

(cleaned up) (citation omitted). As a result, "professors at public universities retain First Amendment protections at least when engaged in *core academic functions*, such as teaching and scholarship." *Id.* (emphasis added). So under *Meriwether*, the threshold question is whether Woodcock was engaged in a core academic function when he spoke about Israel. *See Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 583–84 (4th Cir. 2023) (finding that a professor's speech was unprotected because it was unrelated to "scholarship or teaching").

The Court has applied *Meriwether* to protect a presentation given by a professor at an off-campus conference. In *Josephson v. Ganzel*, a professor spoke at an off-campus event during which the panel's moderator "advised the audience" that the professor spoke in his individual capacity. 115 F.4th 771, 784 (6th Cir. 2024). On those facts, the Court concluded that the professor did not speak as "part of his official duties." *Id.* The Court also determined that speaking on a panel about a topic that "stemmed from [the professor's] scholarship and thus related to scholarship or teaching" created protection for the professor's speech. *Id.* at 786. Putting *Meriwether* and *Josephson* together, a professor's classroom teaching and scholarship generally receive First Amendment protection, as does on-topic speech at a conference that is within the professor's expertise.

Woodcock's alleged speech is not part of his core academic functions. Although the record is undeveloped at this early stage, it does not appear that UK is considering disciplining Woodcock for classroom speech, as was done in *Meriwether*. Indeed,

Woodcock insists that he has not discussed his views about Israel in the classroom. Trans., R.40, PageID#1819. As best as the Attorney General can tell, the closest to the classroom that UK's investigation comes is Woodcock's alleged statement during an "optional lecture" that he would not invite a pro-Israel speaker because such a speaker is "pro-genocide." Am. Notice of Investigation, R.23-3, PageID#1322. But this statement arose from an internal dispute about students sending a message on a university listserv. Trans., R.40, PageID#1841–42. Woodcock has explained that his resulting statement traced to his belief that "we as faculty, particularly tenured faculty, who believe that what is going on is morally wrong have a duty to speak so that students don't get into trouble speaking." *Id.* at PageID#1843. Woodcock's statement about this internal university issue is nothing like the classroom speech at issue in *Meriwether. See Porter*, 72 F.4th at 583–84 (finding that two "wholly internal communications" by a professor were unprotected); *Kyrkanides v. Kluemper*, No. 5:21-cv-00270, 2026 WL 766491, at *7 (E.D. Ky. Mar. 18, 2026), *appeal pending* No. 26-5336 (6th Cir.) ("Dr. Kyrkanides's statements concerned neither teaching qua teaching, nor scholarship; they concerned matters of scheduling, salary, and credentialing."). On this record, Woodcock's speech about an internal university issue is more analogous to typical employee speech that is unprotected under *Garcetti* than to academic speech that is protected under *Meriwether*.

As to whether UK is investigating Woodcock's formal scholarship, the record is undeveloped as well. Even still, nothing in UK's notice or amended notice of

investigation states that Woodcock's formal scholarship is a target of the investigation. After all, Woodcock's faculty biography on the law school's website identifies him as a law-and-economics scholar, with a focus on antitrust law, and does not list *any* Israel-related scholarship. *Supra* at 4. To be sure, it is likely that UK is investigating Woodcock's Israel-related writings given the general topics in the amended notice of investigation. *See* Am. Notice of Investigation, R.23-3, PageID#1321–22. Plus, according to UK, Woodcock allegedly "spammed" listservs to which he has access as a professor and allegedly used UK's resources to circulate an online petition entitled "Petition for Military Action Against Israel." Notice of Investigation, R.23-1, PageID#1307.

*Meriwether*, however, does not say that everything a professor writes is protected speech. Indeed, *Meriwether* was about classroom speech, not about a professor's scholarship. 992 F.3d at 498–502. *Meriwether* accordingly had no occasion to tell us which writings by a professor receive protection. More specifically, *Meriwether* nowhere suggests that spamming one's personal views on listservs to which a professor's employment gives him access[6] and using university resources to circulate an online petition calling for military action against Israel, as UK alleges Woodcock has done, qualify as protected scholarship. That is especially true because by all accounts Woodcock is a

---

[6] To be clear, the Attorney General's position is not that faculty listservs never receive protection under *Meriwether*. The allegation here is that Woodcock spammed these listservs with his personal views—an allegation that Woodcock disputes. Trans., R.40, PageID#1830–33. This dispute underscores the necessity of UK's investigation.

law-and-economics and antitrust scholar. Trans., R.40, PageID#1809. According to Woodcock, his interest in "international law decolonization and specifically the context of Palestine" arose "[l]ately." *Id. Meriwether* does not protect a professor's writings regardless of topic and regardless of the professor's expertise. If Woodcock were being investigated for his law-and-economics or antitrust writings, the *Meriwether* analysis would be different.

In prior filings, Woodcock has emphasized the part of *Meriwether* stating that "the academic-freedom exception to *Garcetti* covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not." 992 F.3d at 507. But this passage, which concerned classroom speech, does not extend First Amendment protection to whatever Woodcock writes regardless of topic and regardless of his expertise. Properly understood, this passage simply recognizes that classroom discussion necessarily touches on additional issues that are not strictly related to course content. Indeed, shortly before this passage, *Meriwether* made that very point. *Id.* at 506 ("Any teacher will tell you that choices about how to lead classroom discussion shape the *content* of the instruction enormously."). That principle has no purchase here.

*Josephson* does not help Woodcock either, even though UK is investigating Woodcock's statements at two conferences. The professor in *Josephson* was invited to speak about a given topic within his expertise, and he did so. As the Court emphasized, the

professor's remarks "were on a topic he taught and wrote about as a child-psychiatry expert." *Josephson*, 115 F.4th at 786. Plus, the moderator made clear that the professor was speaking in his individual capacity. *Id.* at 784. On this record, Woodcock's Israel-related statements at the two conferences differ in material respects. Woodcock admits that the panels were not about Israel. Trans., R.40, PageID#1835, 1838–39. Indeed, watching Woodcock's recorded remarks shows just how jarringly irrelevant his Israel-related statements were. And Woodcock admits that he did not say at either conference that he was speaking in his individual capacity. *Id.* at PageID#1879. In fact, during part of the recording of Woodcock's remarks, the video identifies him as a UK professor. So although Woodcock is in fact being investigated for statements at conferences, the similarities to *Josephson* end there. Put simply, *Josephson* does not extend First Amendment protection to Woodcock's irrelevant remarks about Israel.

Even if Woodcock has shown a likelihood that his speech is protected under *Meriwether* and *Josephson*, that does not end the constitutional inquiry. Woodcock must also have a likelihood of success under *Pickering* balancing—that is, that his interest in speaking outweighs UK's interest in "promoting the efficiency of the public services it performs through him." *See Meriwether*, 992 F.3d at 508 (cleaned up) (citation omitted). In a merits appeal after trial, *Pickering* balancing can be a fraught exercise. *See Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 553–55 (6th Cir. 2020) (Murphy,

J., concurring in the judgment). This difficulty is necessarily magnified on this limited record in which UK hasn't yet decided whether to discipline Woodcock.

That Woodcock's brief fails even to mention *Pickering* balancing shows that he cannot prevail at this juncture. While UK gathers the facts, it has a substantial interest in efficient operations in the interim. *See Connick v. Myers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."). For obvious reasons, a temporary reassignment with pay is an essential tool for a university to give it the space to figure out what happened without risking harm to students. That is why a temporary reassignment with pay is UK's stand-ard protocol while it investigates whether a hostile environment existed. *See* Trans., R.40, PageID#1954, 1972–73. The UK Dean testified without contradiction that this interim measure is "for [Woodcock's] own benefit and those of the students based on allegations that have been made." *Id.* at PageID#1970. The UK Dean added that the temporary reassignment was necessary "because we do live in a pretty volatile time." *Id.* at PageID#1973. It does not take any imagination to understand how disruptive—even fear inducing—it could be, especially for Jewish students, for Woodcock (as UK is in-vestigating) to "call for violence against Israel, the genocide of Israeli people who are predominantly Jewish, and the ultimate destruction of Israel." Am. Notice of Investi-gation, R.23-3, PageID#1321. UK therefore has a substantial interest in getting to the

bottom of what happened to determine whether discipline is warranted while protecting students in the meantime. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (avoiding interference with the proper functioning of a government entity "can be a strong state interest"). Indeed, as UK has noted, doing nothing could lead to Title VI liability. *See Malick v. Croswell-Lexington Dist. Schs.*, 148 F.4th 855, 862 (6th Cir. 2025) (noting that "every Circuit to consider" whether a deliberate-indifference claim is permissible under Title VI "agrees that it" is).

Two further aspects of Woodcock's alleged speech reinforce this conclusion. First, on this record, the statements by Woodcock that UK is investigating were not made during private conversations. *See Rankin*, 483 U.S. at 389 (finding it relevant that the employee's speech "took place in an area to which there was ordinarily no public access; her remark was evidently made in a private conversation with another employee"). As discussed above, Woodcock made two of his statements during panel presentations, one of which is accessible online. Notice of Investigation, R.23-1, PageID#1306–07. Woodcock broadcast other of his alleged statements online, on listservs, and in an optional lecture. *Id.* at PageID#1307; Am. Notice of Investigation, R.23-3, PageID#1322. The most private of Woodcock's alleged statements was allegedly shouting "Free Palestine" while in a car with UK students. Am. Notice of Investigation, R.23-3, PageID#1322. But this statement was not part of a private conversation with the students but something he allegedly yelled towards individuals on a public

27

street. *Id.*; Trans., R.40, PageID#1848. In short, Woodcock's statements were not in any sense private.

Second, the fact that Woodcock's statements are associated with UK underscores the university's institutional concerns. *See Bennett*, 977 F.3d at 542 (finding that a public employee's "public comments" were made "without a disclaimer that the views were hers alone"). UK has alleged that Woodcock used university resources in making some of the statements. Notice of Investigation, R.23-1, PageID#1307. And UK is investigating whether Woodcock "*us*[*ed*] *his official position* as a University of Kentucky professor to call for violence against Israel, the genocide of Israeli people who are predominantly Jewish, and the ultimate destruction of Israel." Am. Notice of Investigation, R.23-3, PageID#1321 (emphasis added). Moreover, for the two conference presentations that UK is investigating, Woodcock admits that he did not say that he was speaking in his individual capacity. Trans., R.40, PageID#1879. As noted above, the recording of one of the presentations identifies him as a UK professor. The bottom line is that the undeniable connection between Woodcock's statements and the university reinforces UK's operational concerns. Putting everything together, UK's interest in a thorough investigation—one that protects both students and Woodcock—more than outweighs Woodcock's interest.

Supreme Court precedent instructs that the government's "reasonable views of its legitimate interests" get "substantial deference" under *Pickering. See Bd. of Cnty.*

*Comm'rs v. Umbehr*, 518 U.S. 668, 678 (1996). Similarly, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52. That "close working relationship" perfectly describes the student-faculty dynamic at any college or university worth its salt. "After all, the classroom is peculiarly the marketplace of ideas." *Meriwether*, 992 F.3d at 505 (cleaned up) (citation omitted). Woodcock will no doubt respond that he cannot participate in that marketplace at present. It must be remembered, however, that all UK has done is reassign Woodcock's duties *for now*—until the completion of an investigation that Woodcock has now hindered for several months. If UK ultimately disciplines Woodcock for some or all of his speech, *Pickering* balancing could (or could not) shake out differently. But UK's interest in a full investigation to protect students necessarily predominates *Pickering* balancing at this stage. As this Court recently emphasized, a university's "business is educating students. When an employee seriously undercuts the university's power to do its basic job, the Constitution doesn't elevate the employee over the public that [the university] exists to serve." *Patterson v. Kent State Univ.*, 155 F.4th 635, 650 (6th Cir. 2025).

**C.** The Attorney General's interest in this appeal is defending the constitutionality of SJR 55. After all, nonenforcement of Kentucky's law would impose a "form of irreparable injury" on the Commonwealth. *See Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (citation omitted). Although Woodcock's complaint challenges SJR 55,

his appellate brief barely mentions it (at 13, 66). That's presumably because we don't know yet whether UK thinks some or all of Woodcock's alleged speech is protected. More to the point, at this point we do not know what UK thinks SJR 55 requires of it in this matter. As a result, any preliminary injunction as to UK's ongoing investigation and temporary reassignment of Woodcock's duties has no bearing on the ultimate constitutionality of SJR 55. The constitutionality of SJR 55 could come into play only if UK decides to discipline Woodcock for antisemitic speech under IHRA's definition.

Think about the issue this way. Courts do not enjoin the enforcement of state laws in the abstract. Courts can enjoin government actors from taking specific acts required by law. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). So far, UK is simply investigating Woodcock's speech. As written, SJR 55 does not require UK to investigate anything. Instead, SJR 55 merely requires UK to use the IHRA definition of antisemitism as guidance while also respecting the First Amendment. 2025 Ky. Acts ch. 157, § 1. Put differently, SJR 55 helps UK identify antisemitic speech while simultaneously reminding the university to follow the First Amendment.

Woodcock's complaint paints the IHRA definition of antisemitism that SJR 55 adopts as guidance as prohibiting "broad categories of constitutionally-protected speech critical of Israel." Compl., R.1, PageID#2. That overbroad characterization, which mistakenly treats IHRA's definition as a rigid speech code, fails on at least two levels. First, SJR 55 emphasizes that public universities should use the IHRA definition

as "guidance" while emphasizing in the same sentence that "the institutions shall adhere to the First Amendment." 2025 Ky. Acts ch. 157, § 1. As written, SJR 55 expressly gives UK the leeway to consider whether Woodcock's speech is protected, which is exactly what the university is currently doing through its investigation. The federal government considers IHRA's definition in the Title VI context in much the same way. 84 Fed. Reg. at 68,779 (noting that in considering IHRA's definition federal "agencies shall not diminish or infringe upon any right protected under Federal law or the First Amendment"). Second, the IHRA definition itself states that it does not capture speech that is merely critical of Israel. It provides that "criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic." IHRA Definition, R.18-1, PageID#179. For these reasons, even if the Court is concerned that UK's investigation and temporary reassignment of Woodcock's duties implicate the First Amendment, the constitutionality of SJR 55 is not presented on this record.

## CONCLUSION

The Attorney General submits that Woodcock's First Amendment retaliation claim is not squarely presented in this appeal. If the Court disagrees, it should hold that Woodcock has not established a likelihood of success on the merits.

Respectfully submitted by,

*s/ Matthew F. Kuhn*
Russell Coleman
 *Attorney General*
Matthew F. Kuhn
 *Solicitor General*
John H. Heyburn
 *Principal Deputy Solicitor General*
Office of Kentucky Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for the Kentucky Attorney General*

# CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32, I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because it contains 7,525 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*s/ Matthew F. Kuhn*

**CERTIFICATE OF SERVICE**

I certify that on April 23, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Matthew F. Kuhn*

# ADDENDUM

The Attorney General designates the following district court documents as relevant to this appeal:

1. Complaint, R.1, PageID#1–40;

2. The Attorney General's motion to intervene, R.16, PageID#159–71;

3. The district court's minute order granting the Attorney General's motion to intervene, R. 17;

4. IHRA's definition of antisemitism, R.18-1, PageID#179–80;

5. Notice of Investigation, R.23-1, PageID#1305–15;

6. Amended Notice of Investigation, R.23-3, PageID#1320–22;

7. Memorandum Opinion and Order, R.37, PageID#1758–98; and

8. Transcript of December 19, 2025 Hearing, R.40, PageID#1802–2042.